**Dr. Dilip K. CHAUDHURI,**
**Plaintiff–Appellant,**

**v.**

**STATE OF TENNESSEE, Tennessee State University; Dr. Annie Neal; Dr. Decatur Rogers; Dr. James A. Hefner; and Dr. Arthur C. Washington, Defendants–Appellees.**

No. 96–5538.

United States Court of Appeals,
Sixth Circuit.

Argued July 29, 1997.

Decided Nov. 18, 1997.

Joseph H. Johnston (argued and briefed), Nashville, TN, for Plaintiff–Appellant.

Linda A. Ross, Asst. Attorney Gen. (argued and briefed), Michael E. Moore (briefed), Office of the Attorney General, Nashville, TN, for State of Tenn., Tennessee State Univ., and Annie Neal.

Leslie A. Bridges (briefed), Office of the Attorney General, Criminal Justice Division, Nashville, TN, Linda A. Ross, Asst. Attorney Gen., Michael E. Moore, Office of the Attorney General, Nashville, TN, for Decatur Rogers, James A. Hefner, and Arthur C. Washington.

Marshall Beil (argued and briefed), Ross & Hardies, New York City, for Amicus Curiae.

Before: JONES, NELSON, and RYAN, Circuit Judges.

NELSON, J., delivered the opinion of the court, in which RYAN, J., joined. JONES, (pp. 240–41), delivered a separate opinion concurring in part and dissenting in part.

## OPINION

DAVID A. NELSON, Circuit Judge.

The question presented here is whether a nonsectarian prayer or moment of silence at a public university function violates the First Amendment. We answer the question "no."

Tennessee State University formerly made it a practice to include invocations and benedictions at certain university events. The plaintiff, Dilip K. Chaudhuri, Ph.D., brought the present lawsuit to contest the constitutionality of this practice. The university then discontinued the prayers and adopted a moment of silence instead. Dr. Chaudhuri challenged the moment of silence as well, alleging that the intent behind the change was to allow the continuation of prayers.

Finding no violation of either the Establishment Clause or the Free Exercise Clause of the First Amendment, the district court entered summary judgment for the defendants. We agree that the practices in question are not unconstitutional. The judgment will be affirmed.

I

Dr. Chaudhuri came to this country from India in 1971, and in due course he became a naturalized United States citizen. He is a tenured professor of mechanical engineering at Tennessee State University in Nashville. An adherent of the Hindu religion, he repeatedly expressed his unhappiness over TSU's custom of having prayers offered at

university functions such as graduation exercises, faculty meetings, dedication ceremonies, and guest lectures.

Responding to a complaint from Dr. Chaudhuri, the general counsel of the State University and Community College System of Tennessee issued an opinion letter to its member institutions in May of 1988. The letter stated that prayers at university events are not unconstitutional if they do not appear to favor or endorse any particular religious view. The letter went on to suggest that a moment of silence would be an "appropriate vehicle for allowing the tradition of prayer without running afoul of the Constitution."

Based on this opinion letter, perhaps, TSU officials decided that prayers at university events should be of a "generic," nonsectarian nature. Many of the newly genericized prayers were delivered by Dr. James Haney, a clergyman and associate professor of history. Such prayers were also offered by local religious leaders at the invitation of TSU. The university did not review the prayers in advance and did not provide any guidelines for content, other than to request that the prayers be nonsectarian and that references to Jesus Christ be omitted.

The following prayer, delivered by Dr. Haney at commencement exercises in May of 1991, was typical:

"Let us pray. Most Heavenly Father, we're thankful for the opportunity to gather here in honor of this class of 1991. For we know that there are so many stories and so many here that are a part of this class today, and we're so grateful, O Heavenly Father, that you've allowed us to come to this occasion, so that we might be able to understand in God all things are possible.

"And so Most Heavenly Father, we thank you for allowing those that have come from such a long distance so that they too might be a part of this great celebration today. With all its important faculty, Tennessee State University is a great institution, and it is a great institution because of the people who are in Tennessee State University.

"And so we're thankful for the faculty that has prepared this class for graduation today. Sometimes it looked as if the prospects for some of them completing the task were quite dim. But we know that they held on through all the trials and tribulations, and they believed in themselves and they believed in Tennessee State University, and so they are part of it today.

"We're thankful for the Administration here at Tennessee State University. Our new president, may he be able to be blessed with the kind of vision that is needed so that he might lead us into the 21st century. O Heavenly Father, we thank Thee for the Maintenance Department and the Janitorial Department, and everybody and everything that had anything to do with the greatness of this great institution.

"Bless us as we go throughout this program. Give us all the things that we need. And deliver us, Most Lovable Heavenly Father, from pessimistic expectations. These and all blessings we ask from a God that we know, let us all say ... Amen."

Dr. Chaudhuri filed his civil rights action against the State of Tennessee, TSU, and several TSU administrators in January of 1991. The complaint alleged that the defendants had violated Title VII of the Civil Rights Act of 1964 by twice failing to promote Dr. Chaudhuri on account of his religion and national origin.[1] The complaint also alleged that the practice of offering prayers at TSU functions violated rights protected by the Establishment and Free Exercise Clauses of the First Amendment. The complaint included a prayer for compensatory damages, as well as declaratory and injunctive relief.

Dr. Chaudhuri asserted that as a TSU faculty member he was required to attend university functions at which prayers were offered. His performance evaluations were based in part on a "university service" com-

1. The district court granted summary judgment for the defendants on one of the Title VII claims and entered judgment for the defendants after a bench trial on the other. Dr. Chaudhuri has not appealed these rulings.

ponent, and he maintained that this included participation in university events.

The defendants responded that Dr. Chaudhuri was not required to attend the functions in question and did not receive lower scores for absenting himself. Faculty members were encouraged to attend certain university-wide events, according to the defendants, but were not required to do so. Attendance was not monitored. The defendants represent that no employee of TSU—including Dr. Chaudhuri—has suffered any adverse consequences for failing to attend a university function of the sort with which we are concerned in this case.

In April of 1993 Dr. Chaudhuri moved for a preliminary injunction that would have prevented the offering of a prayer at commencement exercises scheduled for the next month. At about the same time that the motion was filed, TSU President James Hefner issued a policy statement announcing that there would be no verbal prayers at the exercises. He informed graduation planners that a moment of silence would be acceptable to "afford dignity and formality to the event ... and to solemnize the occasion." On the strength of the new TSU policy, the district court denied Dr. Chaudhuri's request for injunctive relief.

The program for the May graduation exercises included a moment of silence. On reaching that point in the program, the speaker asked everyone to rise and remain silent. The moment that followed proved less than silent. Someone, or a group of people, began to recite the Lord's Prayer aloud. Many audience members joined in—spontaneously, by all accounts—and loud applause followed. TSU officials say they had no advance knowledge of what was going to happen.

Dr. Chaudhuri filed a second motion for a preliminary injunction, pointing out that prayers were still being delivered at university functions other than graduation ceremonies. In light of the incident at the graduation ceremony, he asked that moments of silence be enjoined as well. President Hefner responded with an affidavit stating that moments of silence would replace prayers at all university functions where prayers had

been offered in the past. Dr. Hefner also attested that he had instructed his staff to clarify that faculty attendance at university events, while encouraged, was not mandatory. The district court denied the injunction.

Summer graduation exercises were scheduled for early August of 1993. The keynote speaker was Dr. David Jones, Jr., a prominent educator and administrator in the Nashville public school system. As noted in the commencement program, Dr. Jones was also the pastor at a local church. When Dr. Jones asked the audience to stand for a moment of silence, a portion of the audience again recited the Lord's Prayer. TSU officials denied complicity in this incident as well.

The defendants eventually moved for summary judgment on all of Dr. Chaudhuri's claims. In January of 1995 the district court granted the motion on the Establishment Clause and Free Exercise Clause claims. *Chaudhuri v. State of Tennessee*, 886 F.Supp. 1374 (M.D.Tenn.1995). After a final judgment had been entered, Dr. Chaudhuri appealed the disposition of his First Amendment claims.

## II

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I. The Due Process Clause of the Fourteenth Amendment makes the Establishment Clause applicable to the states. *Widmar v. Vincent*, 454 U.S. 263, 271 n. 8, 102 S.Ct. 269, 275 n. 8, 70 L.Ed.2d 440 (1981); *Pinette v. Capitol Square Review & Advisory Bd.*, 30 F.3d 675, 677 (6th Cir.1994), *aff'd*, 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). As a state university, TSU is thus subject to the strictures of the Establishment Clause.

Although the university has abandoned its practice of including verbal prayers at its events, Dr. Chaudhuri's challenge to that practice remains a live controversy insofar as he is seeking money damages on account of it. His claims for injunctive and declaratory relief with respect to the prayers appear to have become moot, however.

## A

In *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111–12, 29 L.Ed.2d 745 (1971), the Supreme Court adopted a three-part test for determining whether state-sponsored activity can pass muster under the Establishment Clause:

> "First, the [state action] must have a secular ... purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the [state action] must not foster an excessive government entanglement with religion." (Citations and quotation marks omitted.)

Although widely criticized and occasionally ignored, the *Lemon* test "still appears to govern Establishment Clause cases." *Americans United for Separation of Church and State v. City of Grand Rapids,* 980 F.2d 1538, 1543 (6th Cir.1992) (*en banc* ); see also *Lee v. Weisman,* 505 U.S. 577, 587, 112 S.Ct. 2649, 2655, 120 L.Ed.2d 467 (1992) ("we do not accept the invitation ... to reconsider our decision in *Lemon v. Kurtzman* "); *Agostini v. Felton,* —— U.S. ——, 117 S.Ct. 1310, 137 L.Ed.2d 473 (1997) (applying *Lemon* ).

### 1

In considering whether a challenged state action has a "secular purpose" under *Lemon,* we inquire "whether government's actual purpose is to endorse or disapprove of religion." *Edwards v. Aguillard,* 482 U.S. 578, 585, 107 S.Ct. 2573, 2578, 96 L.Ed.2d 510 (1987) (quotation and citation omitted); see also *Wallace v. Jaffree,* 472 U.S. 38, 56, 105 S.Ct. 2479, 2489–90, 86 L.Ed.2d 29 (1985). The government's purpose need not be exclusively secular, *Lynch v. Donnelly,* 465 U.S. 668, 681 and n. 6, 104 S.Ct. 1355, 1363, 79 L.Ed.2d 604 (1984); *Bown v. Gwinnett County Sch. Dist.,* 112 F.3d 1464, 1469 (11th Cir.1997), for a "[f]ocus exclusively on the religious component of any activity would inevitably lead to its invalidation...." *Lynch,* 465 U.S. at 680, 104 S.Ct. at 1362. Unless it seems to be a sham, moreover, the government's assertion of a legitimate secular purpose is entitled to deference. *Edwards,* 482 U.S. at 586–87, 107 S.Ct. at 2579–80; *Bown,* 112 F.3d at 1469. We must be cautious about attributing unconstitutional motives to state officials. See *Mueller v. Allen,* 463 U.S. 388, 394, 103 S.Ct. 3062, 3066–67, 77 L.Ed.2d 721 (1983).

TSU's former practice of including nonsectarian prayers at its events met the "secular purpose" element of the *Lemon* test, in our opinion. A prayer may serve to dignify or to memorialize a public occasion. As TSU puts it, quoting *County of Allegheny v. American Civil Liberties Union,* 492 U.S. 573, 625, 109 S.Ct. 3086, 3118–19, 106 L.Ed.2d 472 (1989) (O'Connor, J., concurring in part and concurring in the judgment), the prayers "solemniz[ed] public occasions, express[ed] confidence in the future, and encourag[ed] the recognition of what is worthy of appreciation in society." These are legitimate secular purposes. See *Tanford v. Brand,* 104 F.3d 982, 986 (7th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 60, —— L.Ed.2d —— (1997). We do not believe that these asserted purposes are a sham designed to allow TSU to proselytize students and faculty members.

Any prayer has a religious component, obviously, but a single-minded focus on the religious aspects of challenged activities—which activities, in an Establishment Clause case, are religiously-oriented by definition—would extirpate from public ceremonies all vestiges of the religious acknowledgments that have been customary at civic affairs in this country since well before the founding of the Republic. The Establishment Clause does not require—and our constitutional tradition does not permit—such hostility toward religion. *Lynch,* 465 U.S. at 673, 104 S.Ct. at 1359. The people of the United States did not adopt the Bill of Rights in order to strip the public square of every last shred of public piety.

Rejecting the label "nonsectarian," Dr. Chaudhuri and *amicus curiae* (the National Committee for Public Education and Religious Liberty) persist in labeling the prayers in question as "Christian." The plaintiff and the Committee imply that TSU's purpose in allowing the prayers was to advance the cause of Christianity. But these prayers, lacking any explicit or implicit reference to Jesus Christ, do not strike us as overtly Christian.

The prayers did, to be sure, evoke a monotheistic tradition not shared by Hindus such as Dr. Chaudhuri. But

"[t]he content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer." *Marsh v. Chambers*, 463 U.S. 783, 794–95, 103 S.Ct. 3330, 3337–38, 77 L.Ed.2d 1019 (1983).

If the verbal prayers had a legitimate secular purpose, as we believe they did, it follows almost *à fortiori* that the moments of silence have such a purpose. This is not a case like *Wallace v. Jaffree*, where the sponsor of a challenged statute declared that his legislation was an "effort to return voluntary prayer to our public schools." *Wallace*, 472 U.S. at 43, 105 S.Ct. at 2482. The record in the case at bar shows that TSU President Hefner instituted the moment of silence in order to "afford dignity and formality to the event . . . and to solemnize the occasion." A moment of silence is clearly a legitimate way to accomplish those objectives.

Dr. Chaudhuri contends that the moments of silence are a ruse designed to foster prayer at TSU functions. In this connection he cites the 1988 opinion letter in which the general counsel of the State University and Community College System said that a moment of silence would be an "appropriate vehicle for allowing the tradition of prayer. . . ." That is not the purpose asserted by TSU's president, however—and for reasons already suggested, we do not believe that the Constitution would be offended if it were.

■ Dr. Chaudhuri also protests that, on each of two separate occasions, members of a graduation audience interrupted a moment of silence with a recital of the Lord's Prayer. But Dr. Chaudhuri admits that there is no evidence of complicity by the university in these incidents. *Amicus curiae* suggests that the university's failure to admonish the crowd amounted to encouragement or endorsement of the recitation of this Christian prayer. We disagree. "The proposition that schools do not endorse everything they fail to censor is not complicated." *Board of Educ. v. Mergens*, 496 U.S. 226, 250, 110 S.Ct. 2356, 2372, 110 L.Ed.2d 191 (1990) (plurality opinion). The Establishment Clause does not require TSU to silence an audience of private citizens.

2

■ We must also determine whether the principal or primary effect of the challenged state action either advances or inhibits religion. *Lemon*, 403 U.S. at 612, 91 S.Ct. at 2111. This part of the test requires us to consider the reaction of a hypothetical reasonable observer. *Pinette*, 30 F.3d at 678–79; *Americans United*, 980 F.2d at 1543–44. If a reasonable observer would conclude that the message communicated is one of either endorsement or disapproval of religion, then the challenged practice is unlawful. *County of Allegheny*, 492 U.S. at 597, 109 S.Ct. at 3103 (plurality opinion); *Americans United*, 980 F.2d at 1543–44.

The principal or primary effect of including generic prayers at public university functions, in our view, is not to advance or inhibit religion. A reasonable observer, it seems to us, would conclude that the nonsectarian prayers delivered at TSU events were intended to solemnize the events and to encourage reflection. A reasonable observer would not conclude that TSU was trying to indoctrinate the audience. It would not be reasonable to suppose that an audience of college-educated adults could be influenced unduly by prayers of the sort in question here. If these prayers "endorsed" religion, the endorsement was indirect, remote, and incidental—and a *de minimis* religious gesture does not, by itself, create an Establishment Clause problem. *Lynch*, 465 U.S. at 683, 104 S.Ct. at 1364; *Tanford*, 104 F.3d at 986. The prayers were no more than a "tolerable acknowledgment of beliefs widely held among the people of this country." *Marsh*, 463 U.S. at 792, 103 S.Ct. at 3336 (1983).

As far as the moment of silence is concerned, it seems even clearer to us that the primary effect entails no significant advance-

ment or inhibition of religion. No reasonable observer could conclude that TSU, merely by requesting a moment of silence at its functions, places its stamp of approval on any particular religion or religion in general. See *Wallace,* 472 U.S. at 73, 105 S.Ct. at 2498–99 (O'Connor, J., concurring in the judgment). A moment of silence is not inherently religious, *id.* at 72, 105 S.Ct. at 2498; a participant may use the time to pray, to stare absently ahead, or to think thoughts of a purely secular nature. The choice is left to the individual, and no one's beliefs are compromised by what may or may not be going through the mind of any other participant. *Id.*

### 3

To pass the final part of the *Lemon* test, the challenged government action must avoid excessive entanglement of church and state. *Lemon,* 403 U.S. at 613, 91 S.Ct. at 2111–12. It does not seem to us that the practice of including nonsectarian prayers or moments of silence at TSU events creates any church-state entanglement at all, let alone "excessive" entanglement.

As to the inclusion of prayers, the role of TSU officials consisted of (1) inviting a local church leader to deliver an invocation and benediction, and (2) requesting that the prayers be nonsectarian in nature. TSU neither reviewed the prayers nor prescribed guidelines for their content, except to request that there be no reference to Jesus Christ. The moments of silence involved no interaction whatever between TSU administrators and any church—and there is, as we have said, nothing inherently religious about a moment of silence.

In sum, any entanglement resulting from the inclusion of nonsectarian prayers at public university functions is, at most, *de minimis.* See *Tanford,* 104 F.3d at 986. The entanglement created by a moment of silence is nil. *Cf. Bown,* 112 F.3d at 1474. Part three of the *Lemon* test poses no more of a problem here than do parts one and two.

### B

In *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), the Supreme Court held it unconstitutional to offer nonsectarian prayers at public middle school and high school graduation exercises. The "dominant facts mark[ing] and control[ling]" the Court's decision were these:

> "State officials direct the performance of a formal religious exercise at promotional and graduation ceremonies for public schools. Even for those students who object to the religious exercise, their attendance and participation in the state-sponsored religious activity are in a fair and real sense obligatory, though the school does not require attendance as a condition for receipt of the diploma." *Id.* at 586, 112 S.Ct. at 2655.

While the graduation exercises in *Lee* were not technically mandatory, the Court thought it would be "formalistic in the extreme" to say that there was any real choice to miss "the one school event most important for the student to attend." *Id.* at 595, 597, 112 S.Ct. at 2659, 2660. In the primary and secondary school context, moreover, there is "subtle coercive pressure" to conform to the state-directed religious exercise. *Id.* at 592, 112 S.Ct. at 2658. "The prayer exercises in this case are especially improper," the Court concluded, "because the State has in every practical sense compelled attendance in an explicit religious exercise at an event of singular importance to every student, one the objecting student had no real alternative to avoid." *Id.* at 598, 112 S.Ct. at 2661.

*Lee v. Weisman* does not control the case at bar. In fact, the *Lee* Court explicitly declined to decide the question presented here:

> "Finding no violation under these circumstances would place objectors in the dilemma of participating, with all that implies, or protesting. We do not address whether that choice is acceptable if the affected citizens are mature adults, but we think the State may not ... place primary and secondary school children in this position." *Id.* at 593, 112 S.Ct. at 2659.

*Lee* attached particular importance to the youth of the audience and the risk of peer pressure and "indirect coercion" in the primary and secondary school context.

"[T]here are heightened concerns," the Court emphasized, "with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Id.* at 592, 112 S.Ct. at 2658.

In contrast to *Lee,* "here there was no coercion—real or otherwise—to participate" in the nonsectarian prayers. *Tanford,* 104 F.3d at 985. Faculty attendance at TSU functions is encouraged but not mandatory. TSU has represented without contradiction that it does not monitor faculty attendance at the university events in question and that no faculty member has ever been penalized for non-attendance. The dean of the engineering school has attested that Dr. Chaudhuri's attendance or non-attendance never affected his evaluations. By no stretch of the imagination can we say that Dr. Chaudhuri's attendance at TSU graduation exercises was "in a fair and real sense obligatory." *Lee,* 505 U.S. at 586, 112 S.Ct. at 2655.

Even if Dr. Chaudhuri had been obliged to attend these events, moreover, he would not have had to participate in the prayers or pay any attention to them. See *Tanford,* 104 F.3d at 985. There was absolutely no risk that Dr. Chaudhuri—or any other unwilling adult listener—would be indoctrinated by exposure to the prayers. The peer pressure and "subtle coercive pressure" that concerned the Court in *Lee* were simply not present here.

We cannot accept the notion that Dr. Chaudhuri was "coerced" into participating in the prayers merely because he was present. He may have found the prayers offensive, but that reaction, in and of itself, does not make them unconstitutional. *Lee,* 505 U.S. at 597, 112 S.Ct. at 2660–61 ("People may take offense at all manner of religious as well as nonreligious messages, but offense alone does not in every case show a violation").

Dr. Chaudhuri and *amicus curiae* say that to focus on a plaintiff's relative maturity would be to turn the Establishment Clause into a children's rights measure. But the Establishment Clause clearly requires case-by-case examination of the particular facts presented. *Lee,* 505 U.S. at 597–98, 112 S.Ct. at 2660–61; *Lynch,* 465 U.S. at 678–79,

104 S.Ct. at 1361–62. The Supreme Court has always considered the age of the audience an important factor in the analysis. See *Mergens,* 496 U.S. at 250, 110 S.Ct. at 2371–72; *Edwards,* 482 U.S. at 583–84, 107 S.Ct. at 2577–78; *Marsh,* 463 U.S. at 792, 103 S.Ct. at 3336 ("Here, the individual claiming injury by the practice is an adult, presumably not readily susceptible to 'religious indoctrination' or peer pressure") (citations omitted); *cf. Widmar,* 454 U.S. at 274 n. 14, 102 S.Ct. at 276 n. 14 ("University students are, of course, young adults. They are less impressionable than younger students and should be able to appreciate that the University's policy is one of neutrality toward religion").

We may safely assume that doctors of philosophy are less susceptible to religious indoctrination than children are. To find a constitutional violation where there is no real threat to religious liberty would be to divorce Establishment Clause analysis from the very purpose of the clause. We conclude that the obvious difference between plaintiffs such as Dr. Chaudhuri and children at an impressionable stage of life "warrants a difference in constitutional results." *Edwards,* 482 U.S. at 584 n. 5, 107 S.Ct. at 2578 n. 5 (quoting *Abington Sch. Dist. v. Schempp,* 374 U.S. 203, 253, 83 S.Ct. 1560, 1587, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring)).

### III

■ Dr. Chaudhuri also contends that TSU's prayers and moments of silence violate the Free Exercise Clause. See U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof*") (emphasis added). Having found that Dr. Chaudhuri was not required to participate in any religious exercise he found objectionable, we conclude that his Free Exercise claim is without merit. There has been no showing that his practice of Hinduism was constrained or abridged in any way.

### IV

"The First Amendment does not prohibit practices which by any realistic measure create none of the dangers which it is

designed to prevent and which do not so directly or substantially involve the state in religion exercises or in the favoring of religion as to have meaningful and practical impact. It is of course true that great consequences can grow from small beginnings, but the measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow." *Lee*, 505 U.S. at 598, 112 S.Ct. at 2661 (quoting *Schempp*, 374 U.S. at 308, 83 S.Ct. at 1616 (Goldberg, J., concurring)).

TSU's bland expressions of gratitude (for the work of campus janitors, *e.g.*), like its expressions of hope for presidential vision and the blessings of divine providence generally, posed no real constitutional threat. They cast nothing more than shadows of constitutional concern. And now that moments of silence have replaced verbal prayers at TSU, even those shadows have been dissipated.

The judgment of the district court is **AFFIRMED**.

NATHANIEL R. JONES, Circuit Judge, concurring and dissenting.

I write separately to express my disagreement with the majority's ambiguous treatment of the nonsectarian prayer-based challenge brought by Chaudhuri.[1] I believe that the issue is ripe for consideration and should have been decided in favor of Chaudhuri. Still, I concur with the majority holding with respect to the moment of silence practices of Tennessee State University (the "University").

" 'Mootness results when events occur during the pendency of the litigation which render the court unable to grant the requested relief.' " *Berger v. Cuyahoga County Bar Ass'n*, 983 F.2d 718, 724 (6th Cir.1993) (*quoting Carras v. Williams*, 807 F.2d 1286, 1289 (6th Cir.1986)). Prior decisions of this court and the Supreme Court make clear that the voluntary cessation of an allegedly illegal act does not automatically render a case moot. *Chicago Teachers Union, Local No. 1 v. Hudson*, 475 U.S. 292, 305 n. 14, 106 S.Ct.

1066, 1075 n. 14, 89 L.Ed.2d 232 (1986); *Linton ex rel. Arnold v. Commissioner of Health and Env't.*, 30 F.3d 55, 57 (6th Cir. 1994); *Weaver v. University of Cincinnati*, 942 F.2d 1039, 1042 (6th Cir.1991). We are compelled to consider "whether there has been complete discontinuance, whether the effects continue after discontinuance, and whether there is any other reason that justifies decision and relief." *Linton*, 30 F.3d at 57 (quoting *Magnuson v. Hickory Hills*, 933 F.2d 562 (7th Cir.1991) and 13A C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION § 3533.7, at 350 (2d ed.1984)).

In the case before us, the University, by order of its president, ceased the nonsectarian prayer practice on June 8, 1993. Although the issue may appear to be settled by virtue of this cessation order, I believe that this court is obligated to pass on the issue for two compelling reasons. First, there is no barrier to reinstatement of the policy, save the risk of a similar lawsuit. Here, the cessation was implemented for an indefinite period of time. This factor alone, in my judgment, requires that this court consider the issue on its merits. *See Chicago Teachers Union, Local No. 1*, 475 U.S. at 305 n. 14, 106 S.Ct. at 1075 n. 14; *Linton ex rel. Arnold*, 30 F.3d at 57; *Weaver*, 942 F.2d at 1042.

Even so, there is another justification for addressing the merits of the challenge. Although the spontaneous recitation of the "Lord's Prayer" during the moment of silence does not comprise state action, this event—which has occurred twice in the past—is demonstrative of the strength of the prayer tradition at the University. Not only does the official decree fail to guarantee that the nonsectarian prayer practice has been discontinued, the community expectations that led officials to persist with the practice—in spite of the substantial legal questions—do not seem to have subsided.

To the extent that the majority has considered the merits of the nonsectarian prayer

---

1. It is unclear from the majority opinion whether this court has passed on the issue or declared it moot. *See* Maj. Op. 234. In my view, Chaudhuri

is entitled to declaratory and injunctive relief on this matter.

challenge, I am compelled to dissent. Although, as the majority opinion states, "we must be cautious about attributing unconstitutional motives to state officials", we must be equally—if not more so—vigilant to guard against quantifying the humiliation visited upon one who follows a non-Christian religion or tradition within a nation that maintains a strong Christian tradition. Maj. Op. 234. The prohibitions against "Establishment" are so fundamental that we must not balance a violation of the Establishment Clause against community norms. It is enough that the clause has been violated.

The violation here occurred due to an institutional refusal to abandon Christian prayer. Even though the University instructed those delivering invocations to eliminate the name "Jesus Christ" from their prayers, several of the speakers testified that the removal of that name constituted the only difference in prayers after the cessation of sectarian prayers.[2] The mere omission of the name Jesus Christ does not *ipso facto* render an otherwise Christian prayer neutral. Rather than determining that a particular name has been omitted from state-sponsored speech, we are required to determine whether the effect of a given state-sponsored practice *establishes* religion. "[W]e must ascertain whether 'the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling dominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices.'" *Cf. County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 597, 109 S.Ct. 3086, 3103, 106 L.Ed.2d 472 (1989) (plurality opinion) (quoting *School District of the City of Grand Rapids v. Ball*, 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985)).

I find it significant that the prayer practices were initially Christian-based. It was only after repeated questioning by Chaudhuri that the University instituted the nonsectarian prayer policy. Given the context, it is likely that the nonsectarian prayers would

have been viewed by Christian adherents as an attempt to preserve the tradition of Christian prayer. Moreover, as is clear from the litigation inspired in some measure by the nonsectarian prayer policy, nonadherents perceived the policy as disapproving of their religious practices. While the prayers at issue here may not be "overtly Christian," even a slightly Christian prayer poses a serious constitutional problem, in my judgment.

The majority has applied a litmus test that will certainly confuse future officials and policy-makers confronted with the increasingly diverse religious orientation of the American public. I cannot resign myself to conclude that the challenge posed by Chaudhuri regarding the nonsectarian prayer practices of the University should be deemed moot. Furthermore, upon a full consideration of the merits, I am convinced that the University sufficiently "established" religion to justify the grant of declaratory and injunctive relief in favor of Chaudhuri. To that extent, I, therefore, respectfully dissent.

---

**2.** A review of the prayer contained in the majority opinion reveals the following references to the Christian Deity: "Heavenly Father" contains a package of religious bias. First, the term "heaven" is Christian. Although other religions may have some concept of an afterlife, the distinct imagery and technical lineage of that word stems

from the Christian religions. Second, the term "Father" denotes a single male deity. According to Chaudhuri's Hindu faith, there is a female deity, Durga, who resides on earth.

