**Neil J. MELLEN & Paul S. Knick, Plaintiffs,**

v.

**Josiah BUNTING, III, in his individual capacity and in his official capacity as Superintendent, Virginia Military Institute, Defendant.**

**No. Civ.A.6:01CV00026.**

United States District Court, W.D. Virginia, Lynchburg Division.

Jan. 24, 2002.

Rebecca K. Glenberg, Richmond, VA, Jane Siobhan Glenn, Brian R. Jones, Jones & Glenn, PLC, Roanoke, VA, for plaintiffs.

Maureen Riley Matsen, Alison Paige Landry, Ashley L. Taylor, Jr., William Henry Hurd, Office of the Attorney General, Richmond, VA, for defendant.

*MEMORANDUM OPINION*

MOON, District Judge.

I.

A.

The issue before the Court is whether the Virginia Military Institute, a state mili-

tary college and a public institution of higher learning, can compose and institute the recitation of a daily supper prayer without violating the First Amendment's guarantee that government "shall make no law respecting an establishment of religion." U.S. CONST. amend. I.[1] In this case, Defendant has established the practice of offering a daily, mealtime prayer for the purpose of assisting the Institute's cadets in developing their "spiritual dimension" by establishing in them "the habit of regular spiritual reflection" and by "exposing them" to a type of prayer commonly embraced by followers of the monotheistic faiths of Judaism, Christianity, and Islam. Because of the intense, coercive environment created by the Institute's adversative method, under which students are instructed to "subordinate [their] own personal desires and well-being to the good of the whole unit," the primary effect of this practice has been to compel students to participate in a state-sponsored religious exercise. Finally, because the prayers are drafted and recited at the direction of the Institute's Superintendent, the result is that government has become impermissibly entangled with religion.

Nothing in a court's application of the First Amendment should be taken as indicating "a hostility toward religion or toward prayer." *Engel v. Vitale*, 370 U.S. 421, 434, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). The Founders of this nation, individuals of faith and believers in the power of prayer, "led the fight for the adoption of our Constitution and also for our Bill of Rights with the very guarantees of religious freedom that forbid the sort of governmental activity" at issue in this case. *Id.* at 434–35, 82 S.Ct. 1261. They led this fight, in part, because of their firm belief

that the practice of religion was "too precious to be either proscribed or prescribed by the State." *Lee v. Weisman*, 505 U.S. 577, 589, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). James Madison voiced the sentiment that governmental establishments of religion, "instead of maintaining the purity and efficacy of Religion, have had a contrary operation." *Id.* at 590, 112 S.Ct. 2649 (quoting James Madison, *Memorial and Remonstrance Against Religious Assessments* (1785), *in* 8 PAPERS OF JAMES MADISON 301 (W. Rachal, et al., eds.1973)). "The Establishment Clause thus stands as an expression of principle on the part of the Founders of our Constitution that religion is too personal, too sacred, too holy, to permit its 'unhallowed perversion' by a civil magistrate." *Engel*, 370 U.S. at 431–32, 82 S.Ct. 1261 (citing Madison's *Memorial and Remonstrance* ).

For these reasons, as well as for those reasons articulated below, this Court concludes that Defendant's actions have violated Plaintiffs' Establishment Clause Rights. Plaintiffs' motion is therefore GRANTED in part and DENIED in part, and Defendant's motion is GRANTED in part and DENIED in part.

## B.

This matter is before the Court on the parties' cross motions for summary judgment. Summary judgment is appropriate according to Rule 56(c) if the movant is able to "show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." "The function of the judge at the summary judgment stage is not to determine the truth of a matter or to weigh credibility, but to determine whether there is any genuine issue of fact...."

---

**1.** The First Amendment, which prohibits Congress from making any law "respecting an establishment of religion," is made binding on the states by application of the Fourteenth Amendment.

*JKC Holding Co., LLC. v. Washington Sports Ventures, Inc.,* 264 F.3d 459, 465 (4th Cir.2001). Thus, if there is a reasonable dispute as to any material fact, then summary judgment is improper. In this case, where there are cross-motions for summary judgment, each motion must be considered individually, and in considering a party's motion, the facts must be viewed in a light most favorable to the non-movant. *Sylvia Dev. Corp. v. Calvert County,* 48 F.3d 810, 817–18 (4th Cir.1995).

## II.

Plaintiffs Neil Mellen and Paul Knick are third-year cadets at the Virginia Military Institute ("VMI" or "the Institute"). Defendant is Josiah Bunting, III, the Superintendent of VMI ("General Bunting" or "the Superintendent"). VMI is one of Virginia's public institutions of higher learning. It is "at all times subject to the control of the [Virginia] General Assembly," and it receives financial support as appropriated by the General Assembly. VA.CODE ANN. § 23–92 (2000). VMI is distinguishable from the Commonwealth's other state-run schools, however, in one, important aspect. As the Supreme Court noted, it is "an incomparable military college." *United States v. Virginia,* 518 U.S. 515, 519, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996).

As a military school, VMI employs the "adversative method," which emphasizes physical rigor, mental stress, absence of privacy, detailed regulation of behavior, and indoctrination of a strict moral code. According to General Bunting, this method is rooted in "the development of self control, self discipline, and the belief that you must subordinate your own personal desires and well-being to the good of the whole unit—qualities important to effective combat leadership." Entering students are exposed to the "rat line," with upperclassmen tormenting and berating new students. The experience is a punishing one, bonding "new cadets to their fellow sufferers and, when they have completed the 7–month experience, to their former tormentors." *United States v. Virginia,* 518 U.S. at 522, 116 S.Ct. 2264.

The adversative method is an essential part of the VMI experience. In the words of Defendant, it is an experience that is "more restrictive and more austere than the regular military." VMI, however, does more than just prepare its cadets for military careers; as an institution, it seeks to create "citizen-soldiers" who are well-prepared to take on leadership positions in civilian or military life. Approximately sixty per cent of the class of 2000 is pursuing a professional life outside of the military. In this way, VMI is distinct from the federal military academies, where all graduates receive commissions in a branch of the armed forces and are obligated to serve on active duty following graduation.

Plaintiffs bring this suit to challenge the VMI practice of offering a daily "prayer of thanks" in the mess hall, before cadets are seated for dinner. The prayers, which had been part of VMI's supper routine in the past, were stopped for a time and then reinstated by the Superintendent in 1995.[2] Plaintiffs insist that the prayers violate their rights under the Establishment Clause of the 1st Amendment to the United States Constitution, and their rights under Article I § 16 of the Virginia Consti-

**2.** It is unclear exactly when the supper prayers were stopped. There is some suggestion that they may have been abandoned in 1972, following the D.C. Circuit's ruling in *Anderson v. Laird,* 466 F.2d 283 (1972), which struck down the practice of mandatory chapel service at the federal military academies. VMI, which had mandatory chapel service at that time as well, voluntarily ended that tradition in the wake of the *Anderson* ruling.

tution and the Virginia Act for Religious Freedom, VA.CODE ANN. § 57–1 (2000). Plaintiffs therefore seek declaratory and injunctive relief, along with nominal damages, costs and attorney's fees.

General Bunting defends the practice of the supper prayer, first arguing that it is part of a larger, non-religious ceremony known as Supper Roll Call ("SRC"). SRC begins each night (except for Saturday night) at 6:30 p.m., with a bugle call to the Corps of Cadets, directing the Corps to form up into companies and battalions in front of the barracks. Once in formation, the Corps marches from the barracks to the mess hall. When the cadets arrive at the mess hall, a cadet (except for a rat), may be permitted to fall out of formation.[3] Cadets that remain in formation then march into the mess hall, where the Corps is presented to the officer in charge. The Corps is then ordered to stand "at rest," which requires that cadets remain standing with their right foot in place. Cadets at rest are permitted to take a sip of a drink or talk quietly with a fellow cadet so long as their actions are not distracting to others.

While the Corps is at rest, brief announcements are made. Following the announcements, one cadet, usually a student known as the "cadet chaplain," reads the daily prayer, as composed by the VMI Chaplain, Col. James S. Park. Depending on the day, the prayer begins with the words, "Almighty God," "O God," "Father God," "Heavenly Father," "Father God,"

or "Sovereign God." Each day's prayer is dedicated to giving thanks or asking for God's blessing. For example, a prayer may thank God for the Institute, ask for God's blessing on the Corps, or give thanks for the love and support of family and friends. Regardless of the specific message, each day's prayer ends with the following invocation: "Now O God, we receive this food and share this meal together with thanksgiving. Amen." Once the prayer is completed, cadets are permitted to sit and enjoy their dinner.

In addition to arguing that the prayer is merely a segment of a non-religious ceremony, Defendant also asserts that the prayer serves an educational purpose: to "give cadets the chance to become alive to a spiritual dimension in their lives.... It accommodates the faith of those who come with faith. For others, it provides a brief moment of reflection on the importance and value of things beyond themselves." Defendant posits that "Commanders in military education settings often include prayers in ceremonies in order to show students that there is such a thing as prayer, to teach broad religious tolerance, and to get students to engage with their own beliefs, whatever they may be." General Bunting further explains that at VMI, the supper prayers "assist cadets who are developing their spiritual dimension without a religion or belief in a deity, by establishing the habit of regular spiritual reflection, and by exposing them to an important

---

**3.** Plaintiffs contend that in order to eat dinner in the mess hall all cadets were, until recently, required to march in with the rest of the Corps. In both his initial and amended answers to Plaintiff's complaint, Defendant admitted that "in order to eat supper during the first seating, cadets typically must march to the mess hall with the rest of the Corps and that, having so entered the mess hall, they are typically present for the various items of business then conducted as well as for the pray-

er." Plaintiffs insist that the practice of allowing cadets to fall out of formation was only adopted because of pressures related to this lawsuit. In assessing a motion for summary judgment, a court must consider the facts in the light most favorable to the nonmovant. Thus, in considering Plaintiffs' motion, the Court has assumed that Defendant's explanation of SRC, as described in the text above, is accurate.

means that many others use to deal with the spiritual dimension." In addition, the prayer "exposes cadets to the sorts of religious expressions they can expect to experience in the military at a variety of gatherings and ceremonies." Finally, "[t]he supper prayers reflect the American tradition of expressing thanks and seeking divine guidance...." Through listening to the prayers, VMI cadets establish a connection to this storied tradition and "with the founders and heroes of the nation, and of the Institute."

### III.

In assessing this Establishment Clause challenge, Plaintiffs contend that VMI's daily supper prayers are to be judged under the three-prong *Lemon* test. *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). General Bunting, however, insists that the *Lemon* test is an "ill fit" for this particular case. In its place, he offers the line of analysis employed in *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). In the alternative, Defendant suggests that this Court should treat this situation not as a pure Establishment Clause case, but as an academic freedom case. *See, e.g. Keyishian v. Bd. of Regents of the Univ. of New York*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Sweezy v. New Hampshire*, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); *Urofsky v. Gilmore*, 216 F.3d 401 (4th Cir.2000). Regardless of which test is applied, this Court finds that the VMI daily supper prayers fail to stand up to constitutional scrutiny. They must therefore be declared unconstitutional.

### A.

Since 1971, when *Lemon v. Kurtzman* was decided, the *Lemon* test has been applied to every Establishment Clause case except for one. *See Edwards v. Aguillard*, 482 U.S. 578, 583 n. 4, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987).[4] The lone exception is *Marsh v. Chambers*. 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). *Marsh* involved a challenge to the Nebraska State Legislature's practice of opening each day's session with a prayer by a chaplain paid with public funds. The Supreme Court held that the practice was constitutional. The Court was specifically influenced by the fact that in September of 1789, the members of the First Congress voted to send the draft of the First Amendment to the states in the very same week that they "voted to appoint and to pay a Chaplain for each House" of Congress. 463 U.S. at 790, 103 S.Ct. 3330. Writing for the Court, Chief Justice Burger reasoned, "This unique history leads us to accept the interpretation of the First Amendment draftsmen who saw no real threat to the Establishment Clause arising from a practice of prayer similar to that now challenged." *Id.* at 791, 103 S.Ct. 3330.

Other cases have emphasized the limited application of the *Marsh* holding. In *Allegheny County v. ACLU*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), the Court refused to interpret *Marsh* to mean that "all accepted practices 200 years old and their equivalents are constitutional today." 492 U.S. at 603, 109 S.Ct. 3086. Rejecting this "sweeping proposition," the Court reaffirmed that, "In *Marsh*, the Court relied specifically on the fact that Congress authorized legislative prayer at

---

**4.** In *Lee v. Weisman,* the Court did not engage in a regimented, step-by-step application of the three parts of the *Lemon* test. The Court did, however, affirm the ruling in *Lemon,* declining "the invitation of petitioners and *amicus* the United States to reconsider our decision in *Lemon v. Kurtzman." Lee,* 505 U.S. at 587, 112 S.Ct. 2649.

the same time that it produced the Bill of Rights." *Id.* at 602–03, 109 S.Ct. 3086. Recognizing the narrow reach of *Marsh,* the Fourth Circuit observed that "the Supreme Court sees the holding of *Marsh* to be predicated on the particular historical circumstances presented in that case." *North Carolina ACLU v. Constangy,* 947 F.2d 1145, 1148 (4th Cir.1991).

This case does not share *Marsh's* "unique history." In fact, the Supreme Court has noted that *Marsh's* "historical approach is not useful in determining the proper role of church and state in public schools, since free public education was virtually nonexistent at the time the Constitution was adopted." *Edwards v. Aguillard,* 482 U.S. 578, 583 n. 4, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). The same can be said of public universities and colleges. American universities in the 18th century were almost exclusively non-secular—created to educate the next generation of clerics and religious scholars. *See* Sarah Howard Jenkins, et. al, *God Talk By Professors Within the Classrooms of Public Institutions of Higher Education: What is Constitutionally Permissible?,* 25 AKRON L.REV. 289, 292–93 (1991). The distinction between public and private universities did not begin to develop until 1819, with the Supreme Court's ruling in *Trustees of Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819). *See* Jenkins, et al., 25 AKRON L.REV. at 292–293. VMI, as the nation's oldest state-supported military college, was not founded until 1839. In short, the present case cannot be subjected to a *Marsh* analysis, because public colleges and universities like VMI did not even exist at the time that the First Amendment was drafted. *Marsh* is therefore inapplicable to the question before this Court.

### B.

Failing to demonstrate that *Marsh v. Chambers* controls, Defendant turns to the Supreme Court's academic freedom jurisprudence. Essentially, Defendant's argument is that the cadets' First Amendment rights must be balanced against the Institute's right to teach the lessons it wishes to teach, in the manner in which it wishes to teach them. In support of this argument, Defendant cites *Keyishian v. Board of Regents of University of New York,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). *Keyishian* involved a challenge by faculty members at the State University of New York to a requirement that each professor sign a certificate swearing that "he was not a Communist, and that if he had ever been a Communist, he had communicated that fact to the President of the State University of New York." *Id.* at 592, 87 S.Ct. 675. In ruling for the plaintiffs and striking down the anti-Communist oath as unconstitutional, the Court noted that academic freedom is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Id.* at 603, 87 S.Ct. 675.

*Keyishian* is inapplicable to the present case. First of all, the *Keyishian* Court did not decide the case on the issue of whether the university had a constitutional right of academic freedom. Rather, the Court chose to strike down the regulations because they were overbroad. The statutes, the Court observed, "seek to bar employment both for association which legitimately may be proscribed and for association which may not be proscribed consistently with First Amendment rights.... We therefore hold that [the challenged laws] are invalid insofar as they proscribe mere knowing membership without any showing of specific intent to further the unlawful aims of the Communist Party...." *Id.* at 609–10, 87 S.Ct. 675.

However, to the extent that the Court did suggest that a university possesses a

right to academic freedom, it did not imply that this right should trump the First Amendment rights of individual citizens. The Court balanced the professors' need for academic freedom against the state of New York's claim that its regulation served the "legitimate and substantial" governmental purpose of "protecting its education system from subversion." *Id.* at 602, 87 S.Ct. 675. In the present case, General Bunting asks this Court to balance the Institute's right to academic freedom, not against another state regulation, but against the constitutional rights of his students. Nothing in *Keyishian* suggests that a school's right to academic freedom would reach so far.

The other Supreme Court ruling to which Defendant looks is *Sweezy v. New Hampshire*, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957), which involved a situation similar to that confronted by the Court in *Keyishian*. In *Sweezy*, the state of New Hampshire authorized its Attorney General to conduct criminal investigations into "subversive" activities. *Id.* at 236, 77 S.Ct. 1203. Mr. Sweezy was interrogated, largely because of a speech he had delivered at the University of New Hampshire. On First Amendment grounds, Sweezy declined to answer certain questions from the Attorney General. For example, he remained silent when asked, "Did you advocate Marxism [during your speech]? Did you express the opinion, or did you make the statement at that time that Socialism was inevitable in America?" *Id.* at 243–44, 77 S.Ct. 1203.

There was no majority opinion in *Sweezy;* three justices joined Chief Justice Warren's opinion while Justice Frankfurter wrote a separate concurrence, in which Justice Harlan joined. The language to which Defendant points is in Justice Frankfurter's concurrence. Justice Frankfurter, noting "the dependence of a free society on free universities," quoted a speech "on behalf of continuing the free spirit of the open universities of South Africa." *Id.* at 262, 77 S.Ct. 1203. The speech concluded that there were "four essential freedoms of a university—to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Id.* at 263, 77 S.Ct. 1203. Despite this strong language, Justice Frankfurter did not base his decision solely on a university's constitutional right to academic freedom. Instead, he found that the issue before the Court was squarely one of "balancing two contending principles—the right of a citizen to political privacy, as protected by the Fourteenth Amendment, and the right of the State to self-protection." *Id.* at 266–67, 77 S.Ct. 1203. Thus, nothing in *Sweezy* supports General Bunting's assertion that a student's Establishment Clause rights can be curtailed by a university's claim of academic freedom.

This understanding of *Sweezy* and *Keyishian* is supported by the Fourth Circuit's ruling in *Urofsky v. Gilmore*, 216 F.3d 401 (2000). In *Urofsky*, six college professors challenged the constitutionality of a Virginia law restricting state employee access to sexually explicit material on the Internet, via state-owned computers. *Id.* at 404. After conducting a detailed review of the history of academic freedom claims, the *Urofsky* court concluded, "Appellees' insistence that the Act violates their rights of academic freedom amounts to a claim that the academic freedom of professors is not only a professional norm, but also a constitutional right. We disagree." *Id.* at 411. As to *Sweezy* specifically, the court held, "In light of this review of the actual holding and rationale in *Sweezy*, it is difficult to understand how that case can be viewed as clearly 'adopting' any academic

freedom right, much less a right of the type claimed by Appellees." *Id.* at 413.

Further evidence of the inapplicability of the academic freedom cases to the present situation is Defendant's inability to define an appropriate test to determine when, in his words, "academic freedom concerns are outweighed by Establishment Clause concerns." Because no court has fashioned such a balancing test, Defendant recommends that this Court apply the "pervasively sectarian" test from *Columbia Union College v. Clarke,* 159 F.3d 151 (4th Cir.1998). *Clarke* involved a challenge by a private, religious college to the state of Maryland's decision to deny the college's grant application. The court held that "direct state funding of the general education courses of a 'pervasively sectarian' institution would violate the Establishment Clause," and then turned to determine whether Columbia Union College was "pervasively sectarian." *Id.* at 162–63. The court ruled that:

> to find religion *pervades* a college to such a degree that religious indoctrination thoroughly dominates secular instruction, the college must in fact possess a great many of the following characteristics: mandatory student worship services; an express preference in hiring and admissions for members of the affiliated church …; academic courses implemented with the primary goal of religious indoctrination; and church dominance over college affairs....

*Id.* at 163.

The inapplicability of this test is obvious. Were VMI to possess *any one* of these characteristics, it would be in violation of the First Amendment's Establishment Clause. The test was fashioned because the court concluded that not every, *private religious* college is "pervasively sectarian," even though it may be "obviously and firm-ly devoted to the ideals and teachings of a given religion." *Id.* at 163. It should go without saying that the creation of any state-supported, public university "devoted to the ideals and teachings" of a specific faith would be unconstitutional.

In sum, VMI's insistence that this case be treated as an "academic freedom" case must fail. This Court therefore turns to determine whether the challenged practice is constitutional under the *Lemon* test.

## IV.

 In *Lemon,* the Court announced, "Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years." 403 U.S. at 612, 91 S.Ct. 2105. First, the challenged practice must have a secular purpose; second, "its principal or primary effect must be one that neither advances nor inhibits religion." *Id.* at 612, 91 S.Ct. 2105. Third, the practice "must not foster 'an excessive government entanglement with religion.'" *Id.* at 613, 91 S.Ct. 2105 (citations omitted). If a practice fails at any one of these three steps, it is unconstitutional.

The *Lemon* test has been criticized by both Justices of the Supreme Court and members of the academic legal community. *See* James E. Ryan, *The Supreme Court and Public Schools,* 86 VA.L.REV. 1335, 1381 n. 231 (noting that the *Lemon* test "has thus far survived, albeit with some modifications"). *See also* Martha McCarthy, *Religion and Education, Whither The Establishment Clause?,* 75 IND.L.J. 123, 128–29 (2000) (observing that "[a] majority of the current justices has voiced dissatisfaction with the *Lemon* test").

Justice O'Connor, for example, in her concurrence in *Lynch v. Donnelly,* found it unclear how "the three parts of the test relate to the principles enshrined in the

Establishment Clause." 465 U.S. 668, 689, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). Justice O'Connor explained that "[f]ocusing on institutional entanglement and on endorsement or disapproval of religion clarifies the *Lemon* test as an analytical device." *Id.* Thus, she articulated what has been labeled the "endorsement standard." *See* McCarthy, 75 IND.L.J. at 129. This test retains at least the first two prongs of the *Lemon* test, but rephrases them as follows. First, "The proper inquiry under the purpose prong of *Lemon* ... is whether the government intends to convey a message of endorsement or disapproval of religion." *Id.* at 691, 104 S.Ct. 1355. Second, as to the effect prong, "What is crucial is that a government practice not have the effect of communicating a message of government endorsement or disapproval of religion." *Id.* at 692, 104 S.Ct. 1355.

In addition to the endorsement test, a "coercion analysis" has been developed in some Supreme Court rulings. *See* McCarthy, 75 IND.L.J. at 129–30. In *Lee v. Weisman*, the Court held, "It is beyond dispute that at a minimum the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise...." 505 U.S. at 587, 112 S.Ct. 2649. The Court focused not on direct, government-mandated coercion, but on pressures that, "though subtle and indirect, can be as real as any overt compulsion." *Id.* at 593, 112 S.Ct. 2649. The discussion of indirect coercion then turned on how a reasonable citizen would perceive the government action, not necessarily on what the government intended. "What to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy." *Id.* at 592,

112 S.Ct. 2649. In short, the Court looked at the actual effect that the challenged practice had on the students in question. Therefore, the coercion test can be viewed as focusing almost exclusively on the second part—the primary effect standard—of the *Lemon* test.

Despite these variations and alterations, the Supreme Court's most recent establishment clause decision, *Santa Fe Ind. Sch. Dist. v. Doe*, reaffirmed the *Lemon* test. The Court held, " 'As in previous cases involving facial challenges on Establishment Clause grounds, we assess the constitutionality of an enactment by reference to the three factors first articulated in *Lemon v. Kurtzman*.' " 530 U.S. 290, 314, 120 S.Ct. 2266 (2000) (quoting *Bowen v. Kendrick*, 487 U.S. 589, 602, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988)). In *Brown v. Gilmore*, the Fourth Circuit Court of Appeals recognized that "in *Lemon*, the Supreme Court articulated a test ... that, while criticized over the years, remains binding precedent." 258 F.3d 265, 275 (2001). Thus, while a court should be mindful of the modifications discussed above, the *Lemon* test remains the appropriate standard by which Establishment Clause claims such as this one are judged.

### A.

The first prong, that the supper prayers must have a secular purpose, presents Defendant with "a fairly low hurdle" to clear. *Brown v. Gilmore*, 258 F.3d 265, 276 (4th Cir.2001) (citing *Koenick v. Felton*, 190 F.3d 259, 266 (4th Cir.1999)). A challenged practice fails on this ground when there is "*no* evidence of a legitimate secular purpose." *Id.* (emphasis in original). At the same time, however, "An act so intrinsically religious as prayer cannot meet, or at least would have difficulty meeting, the secular purpose prong of the *Lemon* test." *North Carolina ACLU v.*

*Constangy*, 947 F.2d 1145, 1150 (4th Cir. 1991).

■ Defendant offers three purposes for the prayers which he claims are secular. First, Defendant contends that the prayers: (1) serve VMI's academic mission "of developing cadets into military and civilian leaders;" (2) serve institutional or expressive purposes; (3) accommodate the religious needs of students, as required by the Free Exercise Clause of the First Amendment. These claims will be considered in turn.

### 1. Educational Mission

General Bunting suggests that the supper prayers aid the educational mission of VMI "by encouraging cadets to reflect on and develop their own spiritual dimension." The General further explains that "prayers recited in the mess hall assist cadets who are developing their spiritual dimension without a religion or belief in a deity, by establishing the habit of regular spiritual reflection, and *by exposing them to an important means that many others use to deal with the spiritual dimension.*" (Emphasis added).

The only logical conclusion that can be drawn from this purpose is that part of the Institute's educational mission, in the eyes of General Bunting, is religious indoctrination. A student is to be exposed to a religious exercise for the purpose of developing his or her "spiritual dimension" in a religious manner similar to that used by "many others" who are followers of a monotheistic faith. Such a purpose is unconstitutional.

Defendant, however, defends this purpose, arguing that the prayers "are generic prayers written to be non-offensive, and to avoid reference to any specific faith." Defendant further explains:

The great majority of Americans—including Christians, Jews and Muslims—believe in a 'monotheistic, personal God.' There is no reason to believe that VMI cadets are any different on this score. A practice that helps these cadets develop their own spiritual dimension—and thus become better military leaders—has a legitimate purpose even if there are some cadets for whom the practice may be unavailing.

Supreme Court cases are unwavering in their agreement that such facts are immaterial. In *Engel v. Vitale,* the Court held, "Neither the fact that the prayer may be denominationally neutral nor the fact that its observance on the part of the students is voluntary can serve to free it from the limitations of the Establishment Clause." 370 U.S. at 430, 82 S.Ct. 1261. Similarly, in *Lee v. Weisman,* the Court noted, "The question is not the good faith of the school in attempting to make the prayer acceptable to most persons, but the legitimacy of its undertaking that enterprise at all when the object is to produce a prayer to be used in a formal religious exercise which students, for all practical purposes, are obliged to attend." 505 U.S. at 588–89, 112 S.Ct. 2649. Simply put, drafting a prayer to conform with generic, religious norms does not make that prayer "secular." The fact that the overwhelming majority of VMI students may subscribe to one of the many faiths encompassed by such a prayer cannot serve to constitutionalize the religious practice. "[S]uch a majoritarian policy 'does not lessen the offense or isolation to the objectors. At best it narrows their number, at worst increases their sense of isolation and affront.' " *Santa Fe,* 530 U.S. at 305, 120 S.Ct. 2266 (quoting *Lee,* 505 U.S. at 594, 112 S.Ct. 2649).

Other aspects of VMI's educational-mission argument also fail to survive constitutional inspection. Defendant states that

the prayers serve two additional, academic purposes: (1) that they sensitize cadets "to the spiritual needs and practices of men and women similar to those whom they may be called upon to lead in military and civilian settings;" and (2) that they familiarize cadets "with the type of prayer often heard in military settings and functions."

These two purposes are reminiscent of the reason given by the United States Secretary of Defense in *Anderson v. Laird,* that "[t]he sole purpose of chapel attendance is to develop in the cadets, through observation of the impact of religion on the lives of others during actual worship services, that sensitivity to religious emotion which is required of a military leader." 466 F.2d 283, 299 (D.C.Cir. 1972) (Leventhal, J., concurring). Judge Leventhal found that despite the government's assertion, there was "an unmistakable religious premise" to the mandatory chapel requirement at the federal military academies. *Id.* He quoted the amicus curiae submission which viewed the government's explanation as "a 'shocking' claim to debase and manipulate religious worship as a mere instructional tool." *Id.*

There is a distinction of constitutional importance between teaching about religion and the practice of religion. *See Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980); *Sch. Dist. of Abington v. Schempp,* 374 U.S. 203, 225, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). In *Stone,* the plaintiffs challenged a Kentucky statute requiring public schools to post a copy of the Ten Commandments in each classroom. The statute further required that with the text of the Commandments would be the following explanation: "The secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States." 449 U.S. at 39, 101 S.Ct. 192. In

a per curiam opinion, the Court held that "[t]he pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature .... and no legislative recitation of a supposed secular purpose can blind us to that fact." *Id.* at 41, 101 S.Ct. 192. The Court continued to explain that while the Kentucky statute was unconstitutional, it would not violate the First Amendment if the Ten Commandments were "integrated into the school curriculum" as part of the "study of history, civilization, ethics, comparative religion, or the like." *Id.* at 42, 101 S.Ct. 192.

As in *Stone,* Defendant in this case does not incorporate the study of Judeo–Christian prayers into the classroom to promote the secular study of religion. Based on the agreed-upon facts of this case, a reasonable fact finder would be compelled to conclude that VMI cadets are led in prayer; they do not study prayer. "However desirable this might be as a matter of private devotion, it is not a permissible state objective under the Establishment Clause." *Id.* at 42, 101 S.Ct. 192.

### 2. Expressive or Institutional Purpose

The second "secular" purpose offered by Defendant is that the prayers serve "expressive/institutional" goals. By this, Defendant means that the prayers serve the "pedagogical and institutional purpose of familiarizing cadets with [the tradition of prayer and thanksgiving], including its relevance to the Founders and principal heroes of the nation and the Institute." No language in the prayers refers to this history or tradition. Defendant contends, however, that the reference is not made through specific words, but through actions. Specifically, General Bunting claims that the prayers, as part of Supper Roll Call, are analogous to the use of prayer at ceremonial occasions. In support of this

argument, Defendant cites to *Tanford v. Brand,* 104 F.3d 982 (7th Cir.1997) (holding that an invocation and benediction at a university commencement ceremony is constitutional), and *Chaudhuri v. Tennessee,* 130 F.3d 232 (6th Cir.1997) (finding a prayer at a university commencement constitutional). The situation confronted by the courts in *Tanford* and *Chaudhuri,* however, are not analogous to the present case.

The *Tanford* court held that prayers at university commencement ceremonies served "the legitimate secular purposes of solemnizing public occasions rather than approving particular religious beliefs." 104 F.3d at 986. Similarly, in *Chaudhuri,* the prayers served "to dignify and memorialize a public occasion"—the graduation exercises of the university. In the present case there is no public occasion or ceremonial event to solemnize or memorialize. The daily exercise of Supper Roll Call is not a special event equivalent to a university's once or twice-a-year graduation exercises.

A brief description of SRC will make this point clear. Beginning with a bugle call at 6:30p.m., VMI cadets come together and form up in companies and battalions. The assembled Corps of Cadets then marches from the barracks to the mess hall. Once in the mess hall, cadets remain at rest while the day's administrative announcements are made. Following announcements, the supper prayer is recited and students sit down to eat. While there is a certain amount of military formality to this exercise, it cannot be said that SRC prayers succeed in "solemnizing public occasions," as that phrase is used in *Lynch v. Donnelly,* 465 U.S. 668, 693, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring), *Chaudhuri,* 130 F.3d at 236, and *Tanford,* 104 F.3d at 986.

A prayer may perform a secular purpose at commencement exercises where it serves to solemnize the occasion. And, as Defendant noted during oral argument, there are special, ceremonial dinners such as an awards ceremony, where a prayer may perform a similar, non-religious function. But simply because some dinners are a part of a ceremony does not make all meals ceremonial. VMI's supper prayer is a standard, daily event—a short, daily, mealtime prayer. The events surrounding the prayer are the reading of the day's administrative announcements and the eating of dinner. This is not a "ceremony" within the meaning of the case law. *See, e.g., Lynch,* 465 U.S. at 693, 104 S.Ct. 1355. It is not a part of a solemn occasion, and it does not memorialize such a ceremony. Defendant's attempt to assert a secular purpose on these grounds, therefore, must fail.

### 3. *Military Accommodation*

The third and final purpose offered by Defendant is that the prayers "accommodate the spiritual needs and free exercise rights of cadets, whose opportunities to meet those needs and exercise those rights are limited by the demands of barracks life and the highly structured nature of the VMI program."

■ The Free Exercise Clause of the First Amendment must be read together with the Establishment Clause. "The Establishment Clause limits any government effort to promote particular religious views to the detriment of those who hold other religious beliefs or no religious beliefs, while the Free Exercise Clause affirmatively requires the government not to interfere with the religious practices of its citizens." *Brown v. Gilmore,* 258 F.3d at 274. Thus, "Not only is the government permitted to accommodate religion without violating the Establishment Clause, at

times it is *required* to do so." *Id.* (emphasis in original). In sum, there is no doubt that VMI is permitted, and perhaps required, to take measures to accommodate the religious needs of its cadets. However, "[t]he principle that government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause." *Lee,* 505 U.S. at 587, 112 S.Ct. 2649. The question in this case, therefore, is whether the recitation of specific prayers at supper oversteps the bounds of accommodation and infringes on Plaintiffs' Establishment Clause rights.

In *Brown,* the Fourth Circuit held that Virginia's moment of silence statute, requiring that each school division "establish the daily observance of one minute of silence in each classroom," was constitutional as "a minor and *nonintrusive* accommodation of religion that does not establish religion." *Id.* at 271, 278 (emphasis added). Explaining its reasoning, the court stated:

> By providing this moment of silence, the State makes no endorsement of religion. Indeed, when instructing Virginia teachers on the implementation of the statute, State officials warned that teachers are not to permit or tolerate "any coercion or overbearing by some students to force others to engage in or refrain from prayer or any other permitted activity." There is simply no evidence to indicate that Virginia has promoted any religion or promoted religion over non-religion.

*Id.* at 278. The court then found that the Virginia statute was "a modest step" towards accommodation of religion that did not cross over the line into the establishment of religion.

In this case, General Bunting rejects Plaintiffs' suggestion that a mandatory moment of silence would accommodate those who wish to pray before a meal. He insists that VMI must go farther and provide "some affirmative support" as a means of accommodating the religious needs of the cadets. The General explains that "affirmative support" is given when the VMI Chaplain "writes a prayer which is then read aloud, thereby 'provid[ing] an opportunity for reflection on the *subject* of each night's prayers.'" (emphasis in original). While the subjects for prayer are partly secular, they are also intertwined with a religious theme. For example, one prayer thanks God for the fact "We are blessed with health, strength, and sound minds . . ." and gives thanks to God "that we are fearfully and wonderfully made." Recognizing that cadets are fortunate to enjoy good health may be a secular subject; testifying that each cadet's good health is due to God's blessing, however, is undeniably a religious sentiment.

This kind of "affirmative support" goes far beyond the "modest step" taken by the Virginia General Assembly in passing a minute of silence law, and leaps into the realm of composing and reciting specific prayers upon which students are directed to reflect. Affirmative support in this case exceeds what the Fourth Circuit labeled an affirmative requirement that government not "interfere with the religious practices of its citizens." *Brown,* 258 F.3d at 274. Here, VMI not only places its stamp of approval on prayer, but goes further and actively encourages cadets to contemplate the specific religious subject of each night's prayer. As the Supreme Court stated in *Engel,* "[T]he constitutional prohibition against laws respecting an establishment of religion must at least mean that in this country it is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by government." 370 U.S. at 425, 82 S.Ct. 1261. The daily

supper prayers at VMI, drafted and recited at the official direction of the Superintendent, go beyond permissible religious accommodation and reach into the sphere of active religious practice. This intrusive act is something that the Establishment Clause forbids.

In sum, Defendant has failed to provide any evidence of a legitimate, secular purpose for these prayers, within the contemplation of the case law. Thus, the practice does not survive scrutiny under the first prong of the *Lemon* test. These daily supper prayers must be declared unconstitutional on these grounds alone. Nevertheless, this Court will continue with the *Lemon* test, analyzing Plaintiffs' challenge under *Lemon v. Kurtzman's* primary effect and entanglement standards.

### B.

A governmental practice is unconstitutional if "its principal or primary effect" either "advances [or] inhibits religion." *Lemon,* 403 U.S. at 612, 91 S.Ct. 2105. Even if this Court were to assume that Defendant's stated purposes for the supper prayers were secular, the Court would still conclude that the primary effect of the prayers is to advance religion. As a result, the practice fails to past the second test articulated by the *Lemon* Court.

At a minimum, the primary effect of a governmental practice is an establishment of religion when religious participation is actually or effectively compelled. *See, e.g., Santa Fe Ind. Sch. Dist. v. Doe,* 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295

(2000); *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992); *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). While Defendant's current policy permits cadets to fall out of formation and remain outside of the mess hall during the prayer recitation, Plaintiffs insist that cadets are effectively coerced into participation.[5] In support of this position, Plaintiffs cite to *Lee, Santa Fe,* and several other cases that concern Establishment Clause challenges in the elementary or secondary school context. Defendant insists that these cases are limited in their application to situations involving young, impressionable children and teenagers "susceptible to pressure from their peers towards conformity." *Santa Fe,* 530 U.S. at 312, 120 S.Ct. 2266 (quoting *Lee,* 505 U.S. at 593, 112 S.Ct. 2649). As a result, Defendant asks this Court not to apply those holdings to this action.

There is no doubt that it would be a violation of the Constitution if the daily prayers at issue in this case were recited in a public high-school lunchroom at the direction of the school's principal. *See Santa Fe Indep. Sch. Dist. v. Doe,* 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (finding the recitation of a prayer before a high-school football game to be unconstitutional); *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (holding that a prayer as part of a high-school graduation ceremony is unconstitutional); *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (holding that the daily recitation of a short

5. Plaintiffs also state that this case should be judged on VMI's original policy, which allegedly did not allow cadets to fall out of formation. Defendant counters that a challenge to the original policy would be moot. Further, Defendant suggests that a challenge based on the policy as applied to VMI "rats," who are not allowed to opt out of the exercise, cannot be considered because Plaintiffs lack standing on that question as they are no longer "rats." In response, Plaintiffs allege that the Supreme Court's "voluntary cessation" exception to the mootness doctrine is applicable. Because the Court finds that the current policy effectively coerces students to participate in a religious exercise, there is no need to consider the original policy or the standing and mootness arguments raised by the parties.

prayer in public schools is unconstitutional). One question, therefore, is whether these prayers are similarly unconstitutional at a state military college.

*Lee* involved a challenge by a 14–year-old student and her father to a public middle school's practice of inviting a rabbi to offer a prayer during the commencement ceremony. Taking the age of the plaintiff into account, the Supreme Court limited its holding: "We do not address whether that choice [between participation and protest in the school-sponsored prayer] is acceptable if the affected citizens are mature adults, but we think the State may not, consistent with the Establishment Clause, place primary and secondary school children in this position." 505 U.S. at 593, 112 S.Ct. 2649. Thus, the Supreme Court was strongly influenced by the age of the audience hearing the prayer.

However, this fact does not mean that the Establishment Clause was being fashioned "as a children's rights measure." *Chaudhuri v. Tennessee*, 130 F.3d 232, 239 (6th Cir.1997). The Supreme Court did not hold that children deserve greater protections under the First Amendment than other citizens. Rather, the Court simply recognized that Establishment Clause challenges must be analyzed on a case-by-case basis. *See Chaudhuri*, 130 F.3d at 239. As the Court noted, "These dominant facts mark and control the confines of our decision: ... Even for those students who object to the religious exercise, their attendance and participation in the state-sponsored religious activity are in a fair and real sense obligatory, though the school district does not require attendance...." 505 U.S. at 586, 112 S.Ct. 2649.

Thus, the issue for the Court was whether the plaintiffs were coerced to participate.

This same method of fact-based analysis was part of the Supreme Court's ruling in *Santa Fe*. There, the Court struck down a public high school's practice of electing a member of the student body to deliver a pre-game prayer over the public address system during football season. In defending this practice, the school district argued that attendance at school football games was purely voluntary. The Court compared the case to *Lee* and acknowledged that "the informal pressure to attend an athletic event is not as strong as a senior's desire to attend her own graduation." 530 U.S. at 311, 120 S.Ct. 2266. Still, the Court concluded that for many students, "the choice between whether to attend these games or to risk facing a personally offensive religious ritual is in no practical sense an easy one." *Id.* at 312, 120 S.Ct. 2266. Even more, the Court found that many high-school students would "feel immense social pressure ... to be involved in the extracurricular event that is American high school football." *Id.* at 311, 120 S.Ct. 2266.[6] Thus, the Court concluded that some students would be effectively coerced into attending a state-sponsored religious event, in violation of their First Amendment rights.

These cases do not, as Defendant suggests, create one Establishment Clause standard for children and a separate one for their parents. The protections afforded by the First Amendment are the same, regardless of the citizen's status as a minor or an adult. Instead, these cases emphasize that each Establishment Clause claim must be analyzed on a case-by-case

---

**6.** The Court found, however, that even without this type of social coercion, there was still a constitutional violation. "Even if we regard every high school student's decision to attend a home football game as purely voluntary, we are nevertheless persuaded that the delivery of a pregame prayer has the improper effect of coercing those present to participate in an act of religious worship." 530 U.S. at 312, 120 S.Ct. 2266.

basis. In conducting this analysis, a court looks to determine whether plaintiffs are coerced into participating in a religious exercise. While children may be more easily coerced into participation than their parents, this does not mean that they are entitled to greater constitutional protections. Instead, it only means that in conducting an analysis of an Establishment Clause claim, a court must be particularly vigilant in those situations where citizens may be subtly and indirectly coerced to participate. The Establishment Clause is concerned with coercion, not children. While the facts may change from case to case, the level of constitutional protection does not.

Similarly, while the Sixth and Seventh Circuit cases of *Chaudhuri v. Tennessee* and *Tanford v. Brand* considered the age of the complainants, their constitutional focus was also on coercion. For example, the *Tanford* court noted that none of the coercive elements that the Supreme Court emphasized in *Lee v. Weisman* were present. "Unlike *Lee,* here there was no coercion—real or otherwise—to participate. Many students chose not to attend the stadium exercises..... [T]he mature stadium attendees [who did attend] were voluntarily present and free to ignore the cleric's remarks. Most remained seated." *Tanford,* 104 F.3d 982, 985–86 (7th Cir. 1997). Based on these facts, the court concluded that the challenged prayer was constitutionally permissible.

In *Chaudhuri* the Sixth Circuit also considered the age of the plaintiff, who was a tenured university professor, and again decided the case on the issue of coercion. The court observed that *"Lee* attached

particular importance to the youth of the audience and the risk of peer pressure," but held that "[t]he peer pressure and 'subtle coercive pressure' that concerned the Court in *Lee* were simply not present here." 130 F.3d at 238, 239.[7] Dr. Chaudhuri's attendance at the graduation ceremony was encouraged, but not mandatory. The university "represented without contradiction that it does not monitor faculty attendance at the university events in question and that no faculty member has ever been penalized for non-attendance." *Id.* Thus, the court ruled that no coercion was present, and held the practice constitutional.

In this case, General Bunting attests that Plaintiffs are not required to remain in formation and march into the mess hall in order to be served dinner. Yet the issue is whether, despite VMI's policy allowing cadets to fall out of formation, are cadets still effectively compelled to participate as members of the Corps. VMI is nationally renown for its use of the adversative method, which relies on intense peer pressure to mold high-school graduates into VMI cadets. General Bunting explains that VMI teaches cadets to "subordinate [their] own personal desires and well-being to the good of the whole unit." That is, there is immense pressure on students, exerted by the school's administration, to subordinate their personal objections to a religious practice and join with the Corps in marching into the mess hall to listen to the daily supper prayer. This coercion is easily as significant as the pressures put on the high-school students in *Santa Fe* to join their classmates and

---

7. To the extent that the *Chaudhuri* court did improperly attempt to define an age-based Establishment Clause rule, it drew the line between mature, educated adults and high-school aged children. Plaintiffs currently before the court may be more mature than high-school students, yet they are obviously not "doctors of philosophy." In short, *Chaudhuri's* consideration of age does not reach the question before this court, which involves undergraduate students still in their teenage years or early twenties.

community members at the Friday-night football game.

The VMI situation is also far more coercive than the graduation ceremony considered by the court in *Tanford*, where students could sit, stand, enter, or leave the sparsely-attended stadium exercises as they chose. While VMI cadets may be able to fall out of formation before entering the mess hall, it is clear that most students do not do so. The Institute puts a great deal of emphasis on the importance of unity and solidarity within the Corps of Cadets. For a cadet to voluntarily withdraw from the formation while his fellow cadets remain standing would be to break with that unity. Therefore, the only conclusion that a reasonable fact finder could reach is that a cadet is under a great deal of pressure to remain with the Corps and march into the mess hall. Once inside the mess hall, cadets are required to remain standing, at rest, during the prayer. They cannot come and go as they choose.

Furthermore, even if a cadet was free to withdraw himself or herself from the supper prayer exercises, in doing so that cadet would miss the day's announcements, which are read out loud before the prayer is recited. Additionally, the cadet would lose out on the sense of comradery that comes with remaining a part of the Corps. In *Santa Fe*, the Court ruled that the Establishment Clause "will not permit the [School] District 'to exact religious conformity from a student as the price' of joining her classmates at a varsity football game.'" *Santa Fe*, 530 U.S. at 312, 120 S.Ct. 2266 (citing *Lee*, 505 U.S. at 595–96, 112 S.Ct. 2649). Forcing a student to make this choice is unconstitutional because "[i]t is a tenet of the First Amendment that the State cannot require one of its citizens to forfeit his or her rights and benefits as the price of resisting conformance to state-sponsored religious practice."

*Lee*, 505 U.S. at 596, 112 S.Ct. 2649. Similarly, the Commonwealth of Virginia cannot place VMI cadets in the position of choosing between their religious principles and full participation in the activities of the Corps.

It is true that the *Lee* Court referred to the subtle, social pressures that exist between teenagers, and not to the type of military coercion that exists at VMI. However, the adversative method exposes students to a type of pressure that is as intense, if not more intense, than what students endure at the average American high school. "[G]overnment may no more use social pressure to enforce orthodoxy than it may use more direct means." *Lee*, 505 U.S. at 594, 112 S.Ct. 2649. By the same token, government may no more use the adversative method than it may use social pressure.

There is no doubt that the adversative method is a hallmark of the VMI experience, and that it is largely responsible for the Institute's impressive, national reputation. It is permissible, and perhaps greatly beneficial, to use such intense, coercive methods to train and prepare military and civilian leaders. However, it is unconstitutional to use these same methods to exact conformity with a state-imposed religious practice. *See Santa Fe*, 530 U.S. at 312, 120 S.Ct. 2266.

### C.

■ The final question to be considered under the *Lemon* test is whether the challenged state action fosters " 'an excessive government entanglement with religion.'" *Lemon*, 403 U.S. at 613, 91 S.Ct. 2105 (quoting *Walz v. Tax Commission*, 397 U.S. 664, 674, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)). On this test as well, Defendant's supper prayers fail to survive scrutiny.

The prayers are drafted by the VMI Chaplain, and they are read, at the direction of the Superintendent, at each night's supper in the VMI mess hall. These prayers are recited, not just because Defendant wishes to accommodate the religious needs of his cadets, but because he wishes to focus the Corps' thoughts on the particular subject embraced by the VMI prayer. Thus, as in *Santa Fe,* "These invocations are authorized by a government policy and take place on government property at government-sponsored school-related events." 530 U.S. at 302, 120 S.Ct. 2266.

"The First Amendment's Religion Clauses mean that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State." *Lee,* 505 U.S. at 589, 112 S.Ct. 2649. In this case, the prayers are a form of government speech that violates this central, constitutional tenet. The Supreme Court has explained that "our precedents do not permit school officials to assist in composing prayers as an incident to a formal exercise for their students." *Id.* at 590, 112 S.Ct. 2649. In composing the prayers in this case, government has become impermissibly entangled with religious practice. This entanglement is unconstitutional.

## V.

Having determined that the VMI supper prayers violate Plaintiffs' Establishment Clause rights, the Court now turns to consider Plaintiffs' claim for nominal damages, costs, and attorney's fees. Defendant counters that these money damages are barred by his right to qualified, good faith immunity.

The test for whether a public official is protected by a claim of qualified immunity is twofold. First, a court must consider "whether a constitutional right would have been violated on the facts alleged." *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 2155, 150 L.Ed.2d 272 (2001). If the court determines that a right would have been violated, then a second question must be asked; in the specific context of the case, was the right "clearly established." *Id.* at 2156. Furthermore, "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*

As mentioned above, this Court has determined that Plaintiffs' constitutional rights have been violated. This qualified immunity inquiry therefore focuses on the second issue, whether that right was clearly established. General Bunting has defended his actions in this case by arguing that Supreme Court precedents striking down other state-sponsored prayers relied on the fact that the plaintiffs in those cases were elementary and secondary-school aged children. In addition, Defendant has pointed to two rulings from the Sixth and Seventh Circuits which found that university commencement prayers, solemnizing an important, public ceremony, were constitutional. For the many reasons articulated above, this Court has determined that the Defendant's legal arguments on this point are flawed. It cannot be said, however, that his arguments were so obviously incorrect that a reasonable government official in Defendant's place should have known that his actions violated Plaintiffs' rights under the Establishment Clause. Thus, Defendant is entitled to the defense of qualified, good faith immunity. Plaintiffs claims for damages, costs and attorney's fees must therefore be dismissed.

## VI.

The final issue before this Court are Plaintiffs' state-law claims under Article I,

§ 16 of the Virginia Constitution and under VA.CODE ANN. § 57–1 (2000). 28 U.S.C. § 1367(a) gives this Court supplemental jurisdiction over the non-federal claims in this case. However, because this Court has granted Plaintiffs relief under the Federal Constitution, there is no need to consider the state-law arguments. Furthermore, this Court may decline to exercise supplemental jurisdiction when "the claim raises a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). For these reasons, this Court declines to exercise supplemental jurisdiction over Plaintiffs' state claims. These claims therefore are dismissed without prejudice.

## VII.

In conclusion, Plaintiffs' motion for summary judgment is GRANTED in part and DENIED in part, and Defendant's motion is GRANTED in part and DENIED in part. Specifically, Plaintiffs' request for a declaratory judgment that VMI's practice of organized, daily prayer at supper violates Plaintiffs' rights under the Establishment Clause is GRANTED. In addition, Plaintiffs' request for a permanent injunction requiring Defendant to cease these daily supper prayers is GRANTED. To the extent that Plaintiffs request an injunction requiring Defendant to cease other prayers at any other mandatory events, the motion is DENIED. The remainder of Plaintiffs' motion for summary judgment is DENIED.

Defendant's motion to dismiss without prejudice Plaintiffs' state-law claims is GRANTED. Defendant's motion to dismiss with prejudice Plaintiffs' claims for monetary damages related to the federal causes of action is GRANTED. The remainder of Defendant's motion for summary judgment is DENIED.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion to all counsel of record, and is further directed to strike this matter from the docket of this Court.

## ORDER

This matter is before the Court on the parties' cross motions for summary judgment. For the reasons stated in the attached Memorandum Opinion, both motions are GRANTED in part and DENIED in part.

Specifically, Plaintiffs' request for a declaratory judgment that VMI's daily supper prayers violates Plaintiffs' rights under the Establishment Clause is GRANTED. In addition, Plaintiffs' request for a permanent injunction requiring Defendant to cease these daily supper prayers is GRANTED. To the extent that Plaintiffs request an injunction requiring Defendant to cease any other prayer at other mandatory events, the motion is DENIED. The remainder of Plaintiffs' motion for summary judgment is DENIED.

Defendant's motion to dismiss without prejudice Plaintiffs' state-law claims is GRANTED. Because Defendant is entitled to the defense of qualified immunity, Defendant's motion to dismiss with prejudice Plaintiffs' claims for monetary damages related to the federal causes of action is GRANTED. The remainder of Defendant's motion for summary judgment is DENIED.

The Clerk of the Court is hereby directed to send a certified copy of this Order to all counsel of record, and is further directed to strike this matter from the docket of this Court.