341 F.3d 312
 Neil J. MELLEN; Paul S. Knick, Plaintiffs-Appellees,
v.
Josiah BUNTING, III, in his individual capacity and in his official capacity as Superintendent, Virginia Military Institute, Defendant-Appellant.
Specialty Research Associates, Inc.; First Principles, Inc.; Coalition of American Veterans, Inc.; Naval Aviation Foundation, Inc.; The National Legal Foundation, Amici Supporting Appellant.
Americans United for Separation of Church and State; Anti-Defamation League; The American Jewish Committee, Amici Supporting Appellees.
Neil J. Mellen; Paul S. Knick, Plaintiffs-Appellants,
v.
Josiah Bunting, III, in his individual capacity and in his official capacity as Superintendent, Virginia Military Institute, Defendant-Appellee.
Americans United for Separation of Church and State; Anti-Defamation League; The American Jewish Committee, Amici Supporting Appellants.
Specialty Research Associates, Inc.; First Principles, Inc.; Coalition of American Veterans, Inc.; Naval Aviation Foundation, Inc.; The National Legal Foundation, Amici Supporting Appellee.
 No. 02-1215.
 No. 02-1267.
 United States Court of Appeals, Fourth Circuit.
 FILED: August 13, 2003.
 ORDER
 
 1
 Before the Court is the appellant's petition for rehearing and rehearing en banc. On the petition for panel rehearing, no judge voted in favor thereof, and panel rehearing is hereby denied.
 
 
 2
 A poll of the Court having been requested on the appellant's petition for rehearing en banc, Judges Widener, Wilkinson, Niemeyer, Luttig, Williams, and Shedd voted in favor thereof. Chief Judge Wilkins, along with Judges Michael, Motz, Traxler, King, and Gregory, voted against rehearing en banc. A majority of the active judges having failed to vote in favor of rehearing en banc, rehearing en banc is also hereby denied.
 
 
 3
 Judges Widener, Wilkinson, and Niemeyer wrote separate opinions, which are filed herewith, dissenting from the denial of rehearing en banc.
 
 
 4
 This Order is entered for the Court at the direction of Judge King.
 
 WIDENER, Circuit Judge, dissenting:
 
 5
 I respectfully dissent from the refusal of this court to hear this case by the en banc court.
 
 
 6
 While I may not agree in each detail with the dissenting opinions of Judges Wilkinson and Niemeyer, I am in general agreement with all of both of those opinions. Any disagreement I have with them is in matters of inconsequential detail.
 
 I.
 
 7
 I am struck with the reliance by the panel on what it obviously believes is some kind of impure motivation on the part of VMI, and while it may be phrased as a comparative, the necessary inflection from the words leaves no doubt as to their meaning. "Nevertheless, a State may disingenuously profess a secular purpose;" "a sham secular purpose from a sincere one;" "General Bunting has proffered several purposes (purportedly secular) for the supper prayer;" "In assessing General Bunting's asserted purposes for the supper prayer."
 
 
 8
 With this support, the panel, then, although stating that it agreed with the conclusion of the district court that part of VMI's educational mission in the eyes of General Bunting is "religious indoctrination" and that the prayer in question is "plainly religious in nature," assumed the supper prayer to be motivated by secular goals, having just previously quoted that "recitation of a prayer `is undeniably religious and has, by its nature, both a religious purpose and effect.'"
 
 
 9
 I have difficulty in ascertaining the underlying meaning of the panel opinion, but the effect of it is to "read into the Bill of Rights ... a philosophy of hostility to religion," Zorach v. Clauson, 343 U.S. 306, 315, 72 S.Ct. 679, 96 L.Ed. 954 (1952), a view warned against by Zorach.
 
 II.
 
 10
 A more general, but no less emphatic, objection to our decision is the frequent and implicitly approved use of prayer and like religious symbolism by branches of the United States government in situations and ceremonies similar to the VMI supper prayer, but more dangerous because of the official imprimatur.
 
 A few examples follow:
 
 11
 An Act of Congress of March 2, 1799, Ch. XXIV, 1 stat. 709, provided that the "[c]ommanders of ships of the United States, having on board chaplains, are to take care, that divine service be performed twice a day, and the sermon preached on Sundays." And in 1800, an even stronger statute provided that ships' commanders "cause all, or as many of the ships company as can be spared from duty, to attend at every performance of the worship of Almighty God." Act of April 23, 1800, ch. 33, 2 stat. 45. On the south wall frieze of the Supreme Court building is a sculpture of Moses with Commandments 6-10. On December 3, 1996, at a dinner in the Great Hall of the Supreme Court, held to honor the new members of the United States Senate and attended by the Vice President, seven associate justices of the Supreme Court and 95 members of the Senate, the dinner prayer was given by the Senate chaplain.[1] At a session of this court, held September 28, 2001, for the investiture of a new member, not only was there an invocation conducted by a minister of the Gospel, there was a benediction by a minister.[2] On November 8, 2002, in the United States district court which has held invalid the VMI supper prayer, at a naturalization ceremony in Abingdon, presided over by two district judges, there was an invocation by a minister of the Gospel and, as well, a benediction by a minister.[3]
 
 
 12
 There has been no hint of complaint with respect to the Acts of Congress encouraging religious services for sailors. Moses, with his tablet, sits astride the Supreme Court's building with the most flagrantly religious document of Judeo-Christian religion. The Supreme Court has the Senate chaplain pray at its dinner. This very court, swearing in a new member, has two ministers in the official ceremony. And the court which outlawed the VMI prayer, has both an invocation and a benediction by a minister of the Gospel in its naturalization ceremony.
 
 
 13
 The only way to logically reconcile the above events with each other and with the decision of the panel is to approve a theory of do as I say, not do as I do, or by a stamp of approval on what may be called the two-Constitution theory, one for the federal government, the other for the States, or simply to lay it off to a hostility to religion. All of these I reject. In my opinion, the panel opinion is simply wrong.
 
 APPENDIX
 PROGRAM REFERENCED IN FOOTNOTE 2
 
 PROGRAM
 
 
 14
 Chief Judge J. Harvie Wilkinson III Presiding
 
 Invocation The Reverend Jeffrey L. Reaves, Sr. Pastor, Good Shepherd Baptist Church Petersburg, Virginia
 Opening Remarks Chief Judge J. Harvie Wilkinson III
 Recognition of Special Guests The Honorable Gerald Bruce Lee District Judge for the Eastern District of Virginia
 Presentation of the Commission Bradford A. Berenson Associate Counsel to the President
 Administration of the Oath Chief Judge J. Harvie Wilkinson III Mrs. Carla L. Gregory
 Robing Adriene, Rachel, and Christina Gregory
 Remarks The Honorable George Allen United States Senator
 Remarks The Honorable Charles S. Robb Governor of Virginia, 1982-1986
 
 15
 The Honorable L. Douglas Wilder Governor of Virginia, 1990-1994
 
 
 Remarks From the Bar
 
 
 16
 Michael A. Glasser, President, The Virginia State Bar
 
 
 17
 David C. Landin, Past President, The Virginia Bar Association
 
 
 18
 Marilynn C. Goss, President, The Old Dominion Bar Association
 
 
 19
 Linda M. Jackson, President, The Virginia Women Attorneys Association
 
 
 20
 M. Janet Palmer, President, The Virginia Association of Black Women Attorneys
 
 
 21
 Gail M. Waddell, President, The Tidewater Chapter of the Federal Bar Association
 
 
 22
 Steven Goodwin, President, The Richmond Chapter of the Federal Bar Association
 
 
 23
 Debra Prillaman, President, The Bar Association of the City of Richmond
 
 
 24
 M. Ann Neil Cosby, The Metropolitan Richmond Women's Bar Association
 
 Remarks Judge Roger L. Gregory
 Benediction The Reverend Dr. Norman W. Smith Pastor, Mount Olive Baptist Church Rectortown, Virginia
 PROGRAM REFERENCED IN FOOTNOTE 3
 PLEDGE OF ALLEGIANCE
 
 25
 I PLEDGE ALLEGIANCE TO THE FLAG OF THE UNITED STATES OF AMERICA AND TO THE REPUBLIC FOR WHICH IT STANDS, ONE NATION, UNDER GOD, INDIVISIBLE, WITH LIBERTY AND JUSTICE FOR ALL.
 
 NATIONAL ANTHEM
 
 26
 O SAY, CAN YOU SEE, BY THE DAWN'S EARLY LIGHT
 
 
 27
 WHAT SO PROUDLY WE HAILED AT THE TWILIGHT'S LAST GLEAMING,
 
 
 28
 WHOSE BROAD STRIPES AND BRIGHT STARS,
 
 
 29
 THROUGH THE PERILOUS FIGHT,
 
 O'ER THE RAMPARTS WE WATCHED
 
 30
 WERE SO GALLANTLY STREAMING?
 
 
 31
 AND THE ROCKET'S RED GLARE, THE BOMBS BURSTING IN AIR,
 
 
 32
 GAVE PROOF THROUGH THE NIGHT,
 
 THAT OUR FLAG WAS STILL THERE
 
 33
 O SAY, DOES THAT STAR SPANGLED BANNER YET WAVE
 
 
 34
 O'ER THE LAND OF THE FREE, AND THE HOME OF THE BRAVE.
 
 APPLICANTS FOR UNITED STATES CITIZENSHIP
 
 35
 Rajeshkumar Ishvarshai Patel India
Trupti Hetal Patel India
Girija Nagaraja India
Talin Jabourian Lebanon
Faisal Tufail Waqar Chaudhry Pakistan
Hetal Chandrakant Patel India
Augusto Antonio Portuondo Cuba
Mae Cha Coleman South Korea
Hansaben Harshadrai Shah India
Hong Van Thi Taylor Vietnam
Thimmoji Rao Nagaraja India
 
 
 36
 Kinda Sawaf Syria
June Ruby Louise Trent United Kingdom
Diane Joy Cross Canada
Pannaben Ashokchandra Shah India
Ashokchandra Ramchand Shah India
Himansu Ashokchandra Shah India
Sami Ferliel Turkey
Muna Faisal Chaudhry Pakistan
Lehlohonolo Tlou Zimbabwe

 NATURALIZATION CEREMONY

 HONORABLE JAMES P. JONES
 HONORABLE GLEN M. WILLIAMS
 PRESIDING

OPENING OF COURT Ron Donelson,
 Acting Chief Deputy U.S. Marshal

PRESENTATION OF COLORS Honor Guard
 Bristol Virginia Police Dept.

INVOCATION Rev. Stan Green
 Grace Christian Fellowship
 Abingdon, Virginia

PRESENTATION OF PETITIONERS Rick Mountcastle
 Assistant United States Attorney
 Western District of Virginia

ADMINISTRATION OF OATH OF
CITIZENSHIP Honorable James P. Jones

PRESENTATION OF CERTIFICATES Honorable James P. Jones

PRESENTATION OF FLAGS Joyce Jones, Deputy Clerk
 U. S. District Court
 
 
 37
 REMARKS TO NEW CITIZENS Honorable James P. Jones
 Honorable Glen M. Williams

PLEDGE OF ALLEGIANCE Kathy Bradley, Deputy Clerk
 U. S. District Court

NATIONAL ANTHEM Elizabeth P. Stokes, Deputy Clerk
 U. S. District Court

BENEDICTION Rev. Stan Green

RETIRING OF COLORS Honor Guard
 Bristol Virginia Police Dept.

ADJOURNMENT Ron Donelson
 Acting Chief Deputy U.S. Marshal
 
 
 
 Notes:
 
 
 [1]
 Center Correspondent, Winter, 1997, Center for Civic Education.
 
 
 [2]
 Program appended
 
 
 [3]
 Program appended
 
 
 
 38
 WILKINSON, Circuit Judge, dissenting from the denial of rehearing en banc:
 
 
 39
 I respect and appreciate the commitment of my colleagues to enforcing the values of the Establishment Clause. It is a commitment that I share. Not every public religious observance is a First Amendment violation, however. Sch. Dist. of Abington Township v. Schempp, 374 U.S. 203, 294, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring). With all respect to the panel, its ruling goes too far. The supper prayer at Virginia Military Institute is the most benign form of religious observance. It is brief and non-sectarian, and it takes place in a higher education setting in which the dangers of coercion are minimal. The observance has existed for years, and it represents a general practice with a longstanding history in our country. To nullify it at this late date will have significant consequences throughout this circuit, including at other military academies and settings where we should be slow to discount the sustaining role of faith.
 
 I.
 
 40
 As in all Establishment Clause challenges, the factual circumstances here are critical. See Lynch v. Donnelly, 465 U.S. 668, 694, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) ("Every government practice must be judged in its unique circumstances....") (O'Connor, J., concurring). Three factors are significant in assessing VMI's observance, and I address each of these in turn.
 
 A.
 
 41
 First, this is an exercise among adults. VMI does not compel anyone to participate directly in the prayer, and the college status of the cadets undermines any argument that they are indirectly coerced to take part in it. If this same observance took place in a primary or secondary school setting, I would regard it in a much different light. But I doubt that cadets who are deemed ready to vote, to fight for our country, and to die for our freedoms, are so impressionable that they will be coerced by a brief, non-sectarian supper prayer.
 
 
 42
 The panel, however, did not believe that the factor of maturity mattered much at all here. This ignores how essential an ingredient the age and maturity of audiences have been in the Supreme Court's decisions. The early school prayer cases dealt only with religious exercises in primary and secondary school classrooms. See Engel v. Vitale, 370 U.S. 421, 424, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); Sch. Dist. of Abington Township v. Schempp, 374 U.S. 203, 205-08, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); Wallace v. Jaffree, 472 U.S. 38, 40, 60, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985). Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (striking down prayers at middle school and high school graduation ceremonies), and Santa Fe Independent School District v. Doe, 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (striking down prayers at high school football games), also dealt with the susceptibility of younger and more impressionable students to religious indoctrination; indeed, both decisions are explicit on this point. The Court in Lee made clear that its decision hinged on the "subtle coercive pressures" that exist in a case involving "school-age children" in the secondary schools, particularly at a high school graduation. See Lee, 505 U.S. at 583, 586, 588, 590, 592-99, 112 S.Ct. 2649. In Santa Fe, the Court emphasized, as it had in Lee, the unique impressionability of school-age children. See Santa Fe, 530 U.S. at 301-02, 305, 307-08, 311-12, 120 S.Ct. 2266. "The potential for undue influence is far less significant with regard to college students who voluntarily enroll in courses. `This distinction warrants a difference in constitutional results.'" Edwards v. Aguillard, 482 U.S. 578, 584 n. 5, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (quoting Schempp, 374 U.S. at 253, 83 S.Ct. 1560 (Brennan, J., concurring)).
 
 
 43
 It is not difficult to understand why the factor of maturity has come to play such an important role in the Supreme Court's school prayer decisions. It is not only that primary and secondary school students are particularly susceptible to religious indoctrination. There is also the greater danger that school authorities may seek to take advantage of this susceptibility to promote their own sectarian beliefs. And the susceptibility of primary and secondary school students may further heighten parental apprehensions that religious practices and principles are being promoted at school that are at odds with those instilled at home. These dangers are vastly diminished in a higher education setting, if indeed they exist at all. It is therefore not surprising that our sister circuits have reached a contrary conclusion from the panel, declining to extend the Court's school prayer decisions to the college environment. See Chaudhuri v. Tennessee, 130 F.3d 232 (6th Cir.1997); Tanford v. Brand, 104 F.3d 982 (7th Cir.1997).
 
 
 44
 Of course, my colleagues cannot fail to acknowledge the more mature character of the cadet corps. Mellen v. Bunting, 327 F.3d 355, 371 (4th Cir.2003). But still they find the supper prayer to be coercive, based on the adversative nature of VMI's training program. Id. at 371-72. This is a shame. The opportunities presented at VMI are altogether open; no one is forced or coerced to attend the school, and neither are they now prohibited from doing so. See United States v. Virginia, 518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). No local school board draws the attendance zone for VMI. The students who attend the college do so by choice. And the thing that leads both men and women to attend VMI voluntarily is that the school is in some respects unique. It is "an incomparable military college" that draws students precisely because of the educational and developmental experience that its training provides. Id. at 519, 116 S.Ct. 2264. With its doors now thankfully open to all, VMI has the chance to combine the best of equal opportunity with the best of tradition. And it is wrong for courts to seize the moment to divest this institution of its educational distinctiveness.
 
 
 45
 In any event, VMI's observance is not coercive in any real sense. The panel found that it is, but in doing so the panel speculated as to the social pressures that VMI's educational system might impose upon cadets. Mellen, 327 F.3d at 371-72. This type of speculation is unwarranted here, because appellees conceded that they faced no adverse consequences for any failure to take part in the prayer, and they did not even claim that they felt pressure to attend or participate in the observance, apart from the basic requirement to stand. See Tape of Oral Argument, Jan. 21, 2003 (Appellee's Response Argument); J.A. 36-37A (Deposition of Appellee Paul S. Knick), 252 ¶ 13 (Declaration of Appellee Neil J. Mellen).
 
 
 46
 Moreover, the record shows that the panel's speculation was inaccurate, as both attendance and participation in the observance are voluntary. First, it is difficult to see how cadets like those challenging VMI's prayer — upper-class cadets — are unduly coerced to attend the mess hall observance. Following the supper roll call, these cadets may fall out of marching formation prior to reaching the mess hall and eat dinner with the faculty or select one of several other dining options. Upper-class cadets can thus avoid attending the suppertime prayer without adverse consequences. I readily understand the pressures that school-age students might face to attend high school graduations and Friday night home football games. See Lee, 505 U.S. at 594-95, 112 S.Ct. 2649; Santa Fe, 530 U.S. at 311-12, 120 S.Ct. 2266. But adult cadets are simply not as prone as younger children might be to the social pressures to attend a mess hall observance.
 
 
 47
 And even if one were to conclude that attendance at the suppertime observance is required — either directly (for first-year cadets) or indirectly (for others that are coerced to attend) — it is implausible to suggest that cadets are coerced to participate in the prayer. As the panel states, "cadets are not obliged to recite the prayer, close their eyes, or bow their heads." Mellen, 327 F.3d at 362. During the prayer, cadets are directed to stand at a "rest" command, which allows them the freedom to move, drink, or even talk, so long as they keep their right feet in place. See J.A. 37 (Deposition of Appellee Paul S. Knick). Thus, a cadet must stand, but he or she can engage in a variety of other conduct.
 
 
 48
 None of these restrictions could possibly coerce a dissenting cadet into believing that he or she was participating in the prayer or was signaling any approval of it to others. No cadet could reasonably believe that the act of standing, in this context, signaled assent to the prayer — all cadets must stand for altogether secular reasons, as ordered by school officials for such things as daily announcements. Moreover, no cadet is required to remain silent, pursuant to the "rest" command. And, of course, merely being present in a room where prayer occurs, or hearing a prayer that might offend one's sensibilities, has not been enough to constitute an Establishment Clause violation. See Lee, 505 U.S. at 597-98, 112 S.Ct. 2649 ("People may take offense at all manner of religious as well as nonreligious messages, but offense alone does not in every case show a violation.").
 
 
 49
 It is thus apparent that neither the early school prayer cases, nor Lee, nor Santa Fe supports the panel's result. The Court in Lee stressed that other "questions of accommodation of religion" that involved "mature adults" were left for future cases. Id. at 593, 598-99, 112 S.Ct. 2649. We face precisely that question here, for the first time. And we have before us an institution that has made a brief, non-sectarian prayer also non-coercive.
 
 B.
 
 50
 Second, it is critical to my view that VMI uses a non-sectarian prayer with no intent to proselytize. There is no suggestion that VMI has tried to make it otherwise. The prayers, which vary depending on the day, are focused generally on giving thanks for the upcoming meal, and on asking God's blessing for the Corps or for the family and friends of the cadets. How this violates the Establishment Clause confounds me. Religious expression can be divisive, but it need not be so. The disparate strands of belief can come together in a broader unity much as streams unite into a river. Such exercises allow us to celebrate common bonds and to join with our fellow citizens in solemnizing rituals, without producing the sort of divisiveness that the Establishment Clause rightly seeks to avoid.
 
 
 51
 The non-denominational, non-indoctrinating character of the prayer is what allows VMI to achieve its secular purposes.[1] As VMI argues, its suppertime observance serves several such purposes, none of which appear to be in dispute. See Appellant's Br. 47-52. First, the prayer has a clear academic purpose: it furthers VMI's stated mission to develop cadets into civilian and military leaders. Id. at 47. Specifically, it familiarizes cadets with religious practices, it encourages religious tolerance, and it aids students in reflecting upon their own beliefs. Id. at 11-13. The prayer also serves an important expressive function: it allows cadets to celebrate the American tradition of "expressing thanksgiving and requesting divine guidance and support" for the challenges that lie ahead. Id. at 48. Just as religious invocations solemnize events like legislative sessions, the VMI prayer solemnizes the supper roll call ceremony, an occasion in which the cadets come together to share an important part of their day. Id. at 49. Finally, the VMI prayer performs an accommodationist function: it facilitates the cadets' exercise of their spiritual needs and free exercise rights. Id. at 50. Given the rigors of life in military school and the limited time that cadets have for themselves, this brief period for personal reflection and, if they so choose, spiritual meditation, is significant. Id. at 50-51.
 
 
 52
 These purposes are not the property of any sect. And they do not contain the slightest hint of proselytization to cadets. They are common to all faiths or even to no faith. In fact, these purposes are similar to the aims that the Supreme Court has regularly considered permissible under the Establishment Clause as valuable accommodations of religion. For example, the Court expressly approved the practice of opening legislative sessions with a prayer. Marsh v. Chambers, 463 U.S. 783, 786, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). It has acknowledged the importance of other government accommodations of religion, such as declaring public holidays and imprinting "In God We Trust" on coins. See Lynch v. Donnelly, 465 U.S. 668, 674-78, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). As Justice O'Connor explained, "[t]hose government acknowledgments of religion serve, in the only ways reasonably possible in our culture, the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society." Id. at 693, 104 S.Ct. 1355 (O'Connor, J., concurring).
 
 C.
 
 53
 Finally, it is significant that this case involves a military setting. VMI is a state-run military college that was created in 1839 for the primary purpose of training future soldiers. Its "distinctive mission," as the Supreme Court has recognized, "is to produce `citizen-soldiers,' men [and women] prepared for leadership in civilian life and in military service." United States v. Virginia, 518 U.S. 515, 520, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). Accordingly, all VMI cadets participate in ROTC programs and train for service in the armed forces. Approximately 40% of the graduates of VMI become commissioned officers. Mellen, 327 F.3d at 361 n. 1. VMI, though offering a liberal arts education to its cadets, has since its founding used the "adversative method," a rigorous training program that subjects cadets to strenuous physical and mental discipline. Experienced school officials with considerable military backgrounds administer the training program, and it is these officials who are charged with the duty of creating the curriculum and selecting the exercises that will best achieve VMI's mission.
 
 
 54
 To encourage unity and teach discipline, these officials created the supper roll call ceremony, an exercise in which all cadets first gather into formation outside their barracks at the call of a bugle horn. After cadets are accounted for and the colors are struck, the cadets march in formation to the mess hall. Once there, the cadets who remain in formation are called to attention and presented to the head faculty member. The cadets are commanded to remain at "rest," and then a VMI official makes daily announcements and the chaplain reads the brief supper prayer. In the considered judgment of the school officials, the supper roll call ceremony — including the religious observance — furthers VMI's core mission by training cadets to become more complete soldiers and civilians, by facilitating the expression of thanks, by providing the occasion for personal meditation and reflection, and, finally, by accommodating the spiritual needs of the corps.
 
 
 55
 The panel adduces not the slightest evidence that officials at VMI have introduced religious division in the ranks. But the panel's problem runs deeper on this score. Its basic misunderstanding comes in the suggestion that all is well because cadets remain free to worship on their own. Mellen, 327 F.3d at 372, 375. This, to be sure, is valuable and true, but it fails to appreciate the full dimensions of military training. One does not fight a war alone. Rather, unit cohesion and bonding are necessary ingredients of success. The process of transforming cadets into soldiers entails a variety of exercises that are aimed at creating just such bonds, and to ban communal exercises is to ban a form of fellowship that may sustain soldiers in their darkest and most dangerous hours. Both the act of prayer and the fact of death may have more meaning if they occur in the company of family or of friends. Sadly, the majority's rule of private reflection only denies the communal value of votive expression when the need is thought, by those entrusted with the training of soldiers, to be the most profound.
 
 D.
 
 56
 The above factors, in combination, make VMI's supper prayer a constitutionally permissible one. VMI's prayer satisfies the requirements of the Lemon test. See Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The panel accepted VMI's stated secular purposes under the first prong of Lemon. Mellen, 327 F.3d at 374. Second, the primary effects of VMI's prayer are permissible ones: within this context, the prayer principally solemnizes the occasion, encourages reflection, and promotes VMI's core training mission.[2] Finally, there is no "excessive" entanglement between government and religion here, since there is no public monitoring of the uses of financial aid by religious entities and there is no need for VMI to interact with any religious organizations. See Koenick v. Felton, 190 F.3d 259, 268 (4th Cir.1999).
 
 
 57
 But beyond the steps of doctrine, the suppertime prayer here represents not some radical religious innovation but the kind of traditional accommodation of religion that society has long made part of our culture. VMI's observance has been practiced for years. Although the current prayer has only been in place since 1995 — it was temporarily discontinued in 1990 due to a change in the dining style of the mess hall — in the past VMI has traditionally sponsored a similar meal-time prayer. Mellen, 327 F.3d at 362 n. 5. And prayer has long been a part of military life in general. See, e.g., J.A. 203-05 (Expert Report of Col. John W. Brinsfield, Ph.D.). But even outside the military context, it is traditional for groups — from legislative bodies to local city councils to private inter-denominational groups like Rotary Clubs — to begin their meals or public meetings with a brief, non-sectarian prayer. In many ways, then, VMI's observance is part of a larger and broader social practice.
 
 
 58
 There is a danger that in overturning long and widely accepted accommodations, courts will divide a community, rather than unite it. A primary aim of the Establishment Clause is to prevent divisiveness over matters of religion. See Lee, 505 U.S. at 587-88, 112 S.Ct. 2649; Hall v. Bradshaw, 630 F.2d 1018, 1021 (4th Cir.1980). I would never contend that the mere longevity of a prayer or practice should somehow insulate it from judicial scrutiny. But the consequences of precipitate decree resonate throughout society and discourage institutional growth and change from within society itself. When courts push too insistently at shared understandings and accommodations — reached over time and given meaning through the customs and rituals of observance — they risk inflaming the sorts of religious passion that the Establishment Clause was intended to prevent.
 
 II.
 
 59
 The ramifications of this decision extend beyond VMI. Despite the panel's best efforts to characterize its opinion as being limited to the facts of this case, I regret to say that I see nothing narrow in its ruling. It immediately impacts The Citadel, another state-operated military school in our circuit. Mealtime observances at the service academies — including the United States Naval Academy within our own circuit — are bound to be affected. It is true, as the panel notes, see Mellen, 327 F.3d at 375 n. 13, that the Virginia General Assembly funds VMI, whereas the federal government funds the United States military and the service academies. But I fail to see how one could make a principled distinction out of this point, as the Establishment Clause unquestionably applies similarly to state and federal government actors. See Everson v. Bd. of Education, 330 U.S. 1, 15-16, 67 S.Ct. 504, 91 L.Ed. 711 (1947).
 
 
 60
 Appellees also claim that, notwithstanding its undisputed mission of training cadets, VMI is merely a liberal arts college that sends only 40% of its students into the armed forces as commissioned officers. The service academies, by contrast, require a commitment to military service from all of their cadets, and thus they are more closely tied to the military and their decisions will be subject to the deference that courts have traditionally accorded to military practice. See Appellant's Answer to Pet. for Reh'g at 9-10; Tape of Oral Argument, Jan. 21, 2003 (Appellee's Response Argument).
 
 
 61
 But this distinction also fails to provide a meaningful basis for preserving the mealtime prayer at Annapolis, given the panel's decision here on VMI. Simply put, all of these schools are government-operated military institutions. VMI has as its primary mission the same goal as do the academies: to train cadets to become military leaders. While VMI's student body is not exclusively made up of future soldiers, its mission and its educational structure are aimed towards that goal. The fact that only 40% of its students become soldiers, while 100% of the cadets at the academies become soldiers, is hardly a basis for any meaningful distinction under the Establishment Clause. Otherwise, we will have deprived VMI of its ability to appropriately train the 40% of its students for the military, simply because it decided to share its training method with other students that willingly seek its benefits.
 
 
 62
 Indeed, the panel accepted VMI's stated justifications for the religious observance — the need to train military and civilian leaders and prepare them for military life — and still struck down VMI's prayer. The service academies would defend their own mealtime observances with the same justifications. By deeming VMI's adversative training as coercive, the panel has made the discipline inherent in all military environments a sufficient basis for invalidating any non-sectarian prayer. It has thrown all such observances into extended litigation and considerable doubt.
 
 III.
 
 63
 In closing, I stress the limited nature of my own view. In expressing the conviction that this exercise is constitutional, I do not suggest that public sponsorship of even non-sectarian prayer is free of serious difficulty. There is, however, a balance to be struck between enforcing the vital dictates of the Establishment Clause and the need not to visit hostility upon religious observance in all its forms. In deciding these questions, we do not operate in a vacuum; we must work within the context of history, tradition, and the stable accommodations reached within society. Viewed in this light, the exercise at VMI does not offend the Constitution. By holding otherwise, the panel has deprived this community of some small but important measure of its richness and meaning.
 
 
 
 Notes:
 
 
 [1]
 Of course, the fact that a prayer is non-sectarian does not make it constitutionally permissible in the elementary and secondary schoolsSee, e.g., Engel v. Vitale, 370 U.S. at 430, 82 S.Ct. 1261; Lee, 505 U.S. at 588-89, 112 S.Ct. 2649. In that context, the Court has found any kind of prayer to be unconstitutional because of the impressionability of children. But this says nothing about whether the non-sectarian character of an observance is an appropriate factor for us to consider here, where we deal with a prayer spoken to adults. In this context, the non-sectarian nature of the prayer is important in my view.
 
 
 [2]
 The observance undoubtedly has a religious effect as well. However, theLemon test makes a practice unconstitutional only if its "principal or primary effect" is a religious one. Lemon, 403 U.S. at 612, 91 S.Ct. 2105. Here, within the context of the supper roll call ceremony, the secular effects of the prayer are in my view the "principal" ones.
 
 
 
 64
 NIEMEYER, Circuit Judge, dissenting from the denial of rehearing en banc:
 
 
 65
 This court, by a vote of 6-6, has declined to rehear en banc this important case in which the panel ruled that a short nondenominational prayer said at the Virginia Military Institute before dinner violated the Establishment Clause of the Constitution. Because the panel extends Supreme Court jurisprudence — which has never found unconstitutional prayer in public colleges and universities — and creates a conflict with the Sixth and Seventh Circuits, which have rejected Establishment Clause challenges to prayers in public universities, this case is especially well suited for en banc review. Because I believe we miss this uncommon opportunity to air the court's views on this important and relevant subject and to provide the Supreme Court with a reasoned discussion of all sides on this issue, I dissent from our refusal to rehear this case en banc.
 
 
 66
 * The Virginia Military Institute (VMI), a State military college in Lexington, Virginia, founded in 1839, offers a liberal education in the context of a highly disciplined military routine with the purpose of preparing cadets for military leadership. Short nondenominational prayers before supper are part of VMI's routine. At 6:30 p.m., a bugle call summons the Corps into formation. After an accountability report, the colors are struck and the Corps marches to the mess hall, where the regimental commander gives the command "Attention!" and presents the Corps to the officer-in-charge. After salutes are exchanged, the regimental commander gives the command "Rest!" Announcements are made and a brief prayer is read by a cadet, after which the Corps is seated and begins its evening meal.
 
 
 67
 The prayers that are used were composed by the VMI Chaplain on the U.S. Army model and are nondenominational, avoiding any reference to a specific faith. The prayer for Monday, for example, reads:
 
 
 68
 Almighty God, we give our thanks for VMI, for its reputation, spirit and ideals. Let your favor continue toward our school and Your grace be abundantly supplied to the Corps. Now O God, we receive this food and share this meal together with thanksgiving. Amen.
 
 Similarly, the Tuesday prayer reads:
 
 69
 Oh God, we ask Your blessing on the Corps. Strengthen our commitment to excellence, establish our hearts in honor, confirm upon us honorable conduct and perfect us in the performance of our duty. Now O God, we receive this food and share this meal together with thanksgiving. Amen.
 
 
 70
 Similar prayers are read for Wednesday through Sunday, with the exception of Saturday, thanking God for families and friends, for health, strength, and sound mind, for success, and for the weekend. No cadet is required to recite the prayer or to show any participation in it. Each merely has to remain standing at rest until the prayer is completed.
 
 
 71
 The plaintiffs, two cadets who applied for admission to VMI and were admitted to its 2002 class, objected to the prayers, and when VMI refused to discontinue the prayers, commenced this action. They alleged in their complaint that they "object[ed] to being required to listen to an official religious prayer as a condition for eating dinner" and that they "object[ed] to being required to stand during the prayer, since standing expresses agreement with or assent to the message of the prayer." In response to the plaintiffs' objections, VMI officials told the plaintiffs that they "did not have to recite the prayer or bow their heads," but they had to "remain standing and not do anything distracting."
 
 
 72
 On cross-motions for summary judgment, the district court found the prayers unconstitutional, in violation of the Establishment Clause. See Mellen v. Bunting, 181 F.Supp.2d 619 (W.D.Va.2002). The panel opinion affirms the judgment of the district court. 327 F.3d 355 (4th Cir.2003).
 
 II
 
 73
 When analyzing whether the Establishment Clause has been violated, the general inquiry is still that governed by Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (holding that State funding of religious schools violated the Establishment Clause). But the principles governing prayers in schools are established more particularly in Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), where the Supreme Court identified the applicable principles and refused either to apply or reconsider its decision in Lemon. The Court explained, "We can decide the case without reconsidering the general constitutional framework by which public schools' efforts to accommodate religion are measured. Thus we do not accept the invitation of the petitioners and amicus the United States to reconsider our decision in Lemon v. Kurtzman." Id. at 587, 112 S.Ct. 2649.
 
 
 74
 In Lee, the Court held that the Establishment Clause prohibited the offering of a prayer by a clergy member at a public school graduation ceremony. The Court observed that "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." 505 U.S. at 592, 112 S.Ct. 2649; see also id. at 593-94, 112 S.Ct. 2649 (noting that "[r]esearch in psychology supports the common assumption that adolescents are often susceptible to pressure from their peers towards conformity, and that the influence is strongest in matters of social convention"). Finding that "the conformity required of the student in this case was too high an exaction to withstand the test of the Establishment Clause," the Court struck down the challenged practice. Id. at 598, 112 S.Ct. 2649.
 
 
 75
 The Supreme Court's decision in Lee was consistent with its earlier holdings in Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (striking down a nondenominational prayer said daily in elementary and secondary schools in New York), and School District of Abington Township v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (striking down the daily recitation of the Lord's Prayer and reading from the Bible in elementary and secondary schools). And Lee was followed and applied in Santa Fe Independent School District v. Doe, 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (striking down a policy in public high school that authorized the school student body to vote on whether an invocation would be delivered at its football games).
 
 
 76
 As the panel opinion in this case recognizes about these cases, "coercion has emerged as a prevailing consideration in the school prayer context." 327 F.3d at 370. But in this jurisprudence, the panel opinion does not stop at the borders of the Supreme Court's holdings. Each of the school prayer cases — Engel, Schempp, Lee, and Santa Fe — involved prayers in elementary and secondary schools, and no Supreme Court case has struck down a prayer spoken in a college or university context. As the Supreme Court in Lee explained, "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools ... [and] prayer exercises in public schools carry a particular risk of indirect coercion." 505 U.S. at 592, 112 S.Ct. 2649. This coercion becomes especially suspect because of the vulnerability of the young sent to public school under compulsion of State law. The Lee Court pointed out that its earlier holding in Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), which upheld prayer in the Nebraska State legislature, was distinguishable on this basis. 505 U.S. at 596-97, 112 S.Ct. 2649. As the Court in Marsh observed, "the individual claiming injury by the [prayer] practice is an adult, presumably not readily susceptible to `religious indoctrination,' or peer pressure." 463 U.S. at 792, 103 S.Ct. 3330 (internal citations omitted).
 
 
 77
 The panel opinion also gives no weight to the fact that, unlike public school children who are required by law to attend public school, cadets in the Corps at VMI are there voluntarily, having seen the program, sought admission to it, and selected it as their choice for a college education and military training.
 
 
 78
 Not only is the panel decision thus not compelled by Supreme Court precedent, it also creates a deep conflict with two other circuits. See Chaudhuri v. Tennessee, 130 F.3d 232 (6th Cir.1997); Tanford v. Brand, 104 F.3d 982 (7th Cir.1997). In Tanford, the Seventh Circuit held that the Establishment Clause did not forbid the giving of a nondenominational invocation and benediction during the graduation ceremony at Indiana University. Distinguishing the facts before it from the "special concerns underlying the Supreme Court's decision in Lee," the court noted that "the mature stadium attendees [at the University commencement] were voluntarily present and free to ignore the cleric's remarks." 104 F.3d at 985-86. And in Chaudhuri, the Sixth Circuit followed the same course, holding that the Establishment Clause did not prohibit nonsectarian prayers or moments of silence at public functions at Tennessee State University. The court stated that "[t]he peer pressure and `subtle coercive pressure' that concerned the Court in Lee were simply not present here" and noted that no adult listener at the university functions "was `coerced' into participating in the prayers merely because he was present." 130 F.3d at 239. Noting the importance of a case-by-case examination under the Establishment Clause, the court emphasized that "the age of the audience [has always been] an important factor in the analysis." Id. And even in considering the challenged prayers and moments of silence under the Lemon test, both Tanford and Chaudhuri maintained that the practices were constitutional. Tanford, 104 F.3d at 986; Chaudhuri, 130 F.3d at 236-38.
 
 
 79
 The panel opinion discounts these two decisions from the Sixth and Seventh Circuits, finding that VMI cadets are "uniquely susceptible to coercion." 327 F.3d at 371. It reasons that VMI's disciplinarian environment characterized by obedience, conformity, and regulation supplies greater coercive pressure than the nonmilitary environments present in the other two courts of appeals cases. Id. at 371-72. This approach, I respectfully submit, attributes a somewhat patronizing level of helplessness and vulnerability to a self-selecting group of men and women who voluntarily expose themselves to a rigorous training environment, the purpose of which is to develop strong leaders. Moreover, it is ironic that the panel implies that VMI cadets, who endure humiliation and tests of physical endurance, are more sensitive to psychological manipulation than their peers at other post-secondary institutions. I submit that, to the contrary, they are adults with demonstrably strong willpower, and just as we differentiate between children and adults in the free speech context, we can differentiate between children and VMI cadets in the religious liberty context. See Lee, 505 U.S. at 593, 112 S.Ct. 2649 ("We do not address whether that choice [between participating or protesting] is acceptable if the affected citizens are mature adults, but we think the State may not ... place primary and secondary school children in this position"); Chaudhuri, 130 F.3d at 238 ("Lee attached particular importance to the youth of the audience and the risk of peer pressure and `indirect coercion' in the primary and secondary school context").
 
 
 80
 An adult possessing the disciplined will-power demonstrated by the cadets at VMI, standing in silence while a short prayer is read, is not forced to engage in any act of worship contrary to his or her beliefs. Cf. Marsh, 463 U.S. at 791, 103 S.Ct. 3330 ("We conclude that legislative prayer presents no more potential for establishment than the provision of school transportation"). Listening to a prayer in that passive posture is no more intrusive than being exposed to the broad array of daily messages involuntarily heard or read to every citizen as the result of legitimate exercises of free speech.
 
 
 81
 It is clear that the holding of the panel opinion in this case is not required by precedent. Rather, it is a new extension of the Establishment Clause, moving in the alarming direction of purging all public places of religion.
 
 III
 
 82
 What the panel opinion fails to acknowledge is that its holding now moves our jurisprudence in a direction that is diametrically opposed to the purpose of the Establishment Clause, which was to promote the freedom of religion by assuring the disestablishment of particular religions that had been selected and favored by State statutes and by custom and by promoting the equality of other religions.
 
 
 83
 Throughout the colonial and founding periods, established churches, which were created by legislation, common law, and practice, dominated the colonies and the States. See Michael McConnell, Establishment and Disestablishment at the Founding, Part I: Establishment of Religion, 44 Wm. & Mary L. Rev. 2105, 2110-30 (2003); see also id. at 2107 (noting that 9 of the 13 colonies had established churches, as did Great Britain and several other countries at the time of the American Revolution). Although many of the colonies rejected the Church of England, they nevertheless did not go so far as to entirely disassociate church from state, instead privileging other churches as establishments. Id. at 2115-30. Indeed, "most members of the founding generation believed deeply that some type of religious conviction was necessary for public virtue, and hence for republican government." Id. at 2109.
 
 
 84
 Current research shows that adoption of the First Amendment did not divide church and state or require anti-religious government. See Philip Hamburger, Separation of Church and State 481 (2002) (concluding that "the constitutional authority for separation is without historical foundation"). Rather, accurately understood, the Establishment Clause was intended to prohibit the granting of unequal privileges among religions. See id. at 101-02; McConnell, supra, at 2207 (stating that the "the issue of government control over religion ... is arguably the most salient aspect of the historical establishment").
 
 
 85
 The religious dissenters who participated in the campaign against establishments and whose claims seem to have affected the wording of the constitutional guarantees against establishments made demands for a religious liberty that limited civil government, especially civil legislation, rather than for a religious liberty conceived as a separation of church and state. Moreover, in attempting to prohibit the civil legislation that would establish religion, they sought to preserve the power of government to legislate on religion in other ways. Accordingly, American constitutions, whether those of the states or that of the United States, said nothing about separation. Nor should any of this be a surprise. All of the dissenting denominations that struggled against establishments had clergy, structures of authority, and other conventional characteristics of institutional churches.
 
 
 86
 Hamburger, supra, at 107. And for Americans at the time of the adoption of the Bill of Rights, the distinction between separation of church and state and freedom from religious establishment was "of profound importance." Id. at 479-80; id. at 480 ("Although the dissenters rejected what they sometimes called a `union of church and state,' they also avoided the other extreme"); id. at 486 (noting that the eighteenth-century advocates of constitutional limits on government establishment of religion, whose struggles led to the adoption of the First Amendment, "no more wanted a separation of church and state than they wanted an establishment").
 
 
 87
 Separation of church and state — the interpretation and application of the Establishment Clause espoused by the panel opinion — only took on constitutional authority "under the cover of an historical myth that conveniently allowed Americans to avoid perceiving the changing character of their constitutional law," id. at 483, when twentieth-century anti-Catholic nativists, buoyed by popular distrust of ecclesiastical authority, seized upon the Establishment Clause as a vehicle for their sentiments, id. at 481.
 
 
 88
 Contrary to what may be expected, the nineteenth-century advocates who desired the separation of church and state as a constitutional right did not rely upon constitutional interpretation to secure this goal. Instead, recognizing separation's inadequate constitutional foundations, they sought constitutional amendments. Only in the twentieth century, after the amendment process had been abandoned, did an interpretive approach prevail, and, by this means, separation became part of American constitutional law.
 
 
 89
 Id. at 285. But as the Founders recognized, "there are myriad connections between religion and government that do not amount to an establishment, let alone a full union of church and state," id. at 486, and "separation ought not be assumed to have any special legitimacy as an early American and thus constitutional idea," id. at 483.
 
 
 90
 In short, the Establishment Clause was a protection for non-established religions, designed to eliminate State differentiation among religions, thereby advancing an equal freedom of religious practice. The dissenters of the period, members of non-established denominations, objected to establishment because of the financial benefits and public control States conferred upon established churches and correspondingly denied non-established churches. Hamburger, supra, at 480. Because the alternative concept of multiple establishments was rejected, McConnell, supra, at 2120, the debate over establishment became a competition among religious denominations, the result of which was the Establishment Clause. "[T]he history of the founding period shows that free exercise and disestablishment were supported politically by the same people, with the strongest support for disestablishment coming from the most evangelical denominations of America." Id. at 2207.
 
 
 91
 Thus, the separation of church and state that underpins the panel opinion has no support from the Establishment Clause. And the Establishment Clause was never understood to prohibit nondenominational prayers in public assemblies.
 
 IV
 
 92
 The importance of the panel opinion and its unprecedented reach cannot be overstated. It is a major abandonment of values embraced by the Founders and by our society during the eighteenth and nineteenth centuries. The Establishment Clause and the Free Exercise Clause were aimed in the same direction of recognizing and promoting the freedom of religious practice, both for its inherent value to participants and as a contributor to the overall abilities of a democracy to function. See Hamburger, supra, at 485 (citing observations by Alexis de Tocqueville to that effect); McConnell, supra, at 2206-07 (same).
 
 
 93
 Failing to recognize this, the panel opinion regrettably treats religion as a virus that somehow will infect the public square if acknowledged in even the most unintrusive of circumstances. This idea is new and certainly foreign to the Establishment Clause. I observe that the panel holding now places religious prayer in a more restrictive category than dirty books by extending unnecessarily the holding of Lee from the child and adolescent context where children and adolescents are required to be present to the adult context where the adults are voluntarily assembled. This is a destructive, not constructive, interpretation of the Establishment Clause. While the plaintiffs as atheists are free to deny for themselves any recognition of spiritual existence, they should not, in claiming the protection of their right to do so, be allowed to require that other adults in public assemblies be deprived of their observance, through prayer, of a spiritual existence.
 
 
 94
 Our 6-6 vote denying en banc consideration by our court leaves the Supreme Court to review, without input from our full court, the substantial historical data providing the purpose and meaning of the Establishment Clause in this context of prayers in adult public assemblies. Moreover, it leaves unsatisfactorily addressed the conflict that is created now between the panel opinion in our circuit and the holdings of the Sixth and Seventh Circuits in Chaudhuri and Tanford.